**KINGSPORT MOTORS, INC., Plaintiff-Appellee, Cross-Appellant,**

v.

**CHRYSLER MOTORS CORPORATION, Defendant-Appellant, Cross-Appellee.**

Nos. 78–1251, 78–1252.

United States Court of Appeals, Sixth Circuit.

Argued July 15, 1980.

Decided March 16, 1981.

Rehearing Denied April 21, 1981.

J. O. Bass, Jr., Bass, Berry & Sims, Nashville, Tenn., for defendant-appellant, cross-appellee.

Wendal D. Jackson, Slaughter, Jackson, Cooper & Watson, Bristol, Tenn., Carl W. Newman, Shannon & Newman, Appalachia, Va., for plaintiff-appellee, cross-appellant.

Before EDWARDS, Chief Judge, KENNEDY, Circuit Judge and SILER,* District Judge.

EDWARDS, Chief Judge.

This is a Dealer's Day In Court action and an antitrust case filed and tried before a judge and jury in the U.S. District Court for the Eastern District of Tennessee.

Plaintiff Kingsport Motors, an automobile dealership, was owned by one, Don

Billings. Kingsport, at the time concerned, was a dual automobile dealership having both a Lincoln-Mercury dealership and a Dodge dealership. After two years of dual operation, the Chrysler Corporation, through a new regional sales manager, objected to the fact that Kingsport had inadequate facilities to display Dodges and urged (or demanded) Kingsport to change its plant and employ Chrysler Realty, a division of the Chrysler Corporation, to secure a more desirable one. Kingsport refused to accept Chrysler Realty's proposals and Chrysler terminated the Dodge dealership on November 16, 1973 giving inadequate facilities as the reason.

This termination was stayed by state court order. As a result, in a proceeding before the Tennessee Motor Vehicle Commission, tentative agreement was reached between the parties by which the plaintiff agreed to acquire new facilities through Chrysler Realty for the display of Dodge cars. When plaintiff balked at signing a statement acknowledging inadequacy of its then existing facilities, Chrysler again terminated the dealership as of the end of 1974.

Kingsport thereupon sued under the Dealer's Day In Court Act, 15 U.S.C. § 1222, and filed an antitrust action under § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. As to the Dealer's Day In Court Act, Kingsport claimed coercive and hence bad faith conduct in Chrysler's termination of its Dodge franchise. Plaintiff alleged a per se antitrust violation based upon a tying arrangement consisting of Chrysler's withholding of its franchise for Dodge cars unless Kingsport accepted Chrysler Realty facilities. Kingsport also alleged that if this arrangement did not constitute a per se violation, it was nonetheless actionable under the rule of reason.

In its Dealer's Day In Court suit, Kingsport sought damages on a "lost profits" theory and on diminution of the going concern value of its business. Kingsport also claimed antitrust damages and the right to

* Honorable Eugene E. Siler, Jr., District Judge, United States District Court for the Eastern and Western Districts of Kentucky, sitting by designation.

have them trebled under the Clayton Act. The District Judge granted Chrysler's motion to dismiss Kingsport's per se antitrust claim but sent to the jury its antitrust claim based on the rule of reason and the Dealer's Day In Court claim. The jury found for Kingsport on both of these claims bringing in a general damage verdict of $450,000 which under the Clayton Act would be subject to being trebled to $1,350,000.

Chrysler filed motions non obstante veredicto as to both judgments. The District Judge denied the Chrysler motion as to the Dealer's Day In Court award but granted it as to the antitrust award. As to the latter, he held that there was no proof representing an antitrust violation based upon an unlawful tying arrangement. In the alternative (presumably if this just stated holding was reversed), he also held that the antitrust damages found by the jury were excessive and not supported by the evidence. He vacated the antitrust damage award on this ground also and alternatively remanded the antitrust case for new trial.

Both parties appeal, Chrysler from the Dealer's Day In Court judgment and denial of its motion n. o. v. and Kingsport from both aspects of the District Judge's vacation of the antitrust judgment.

The issues may appropriately be stated as follows:

### Chrysler's Appeal

(1) Was there substantial evidence, viewed as a whole, to support a verdict for Plaintiff on its Dealer's Day in Court Act Claim?

### Kingsport's Appeal

(1) Did Plaintiff offer evidence of a *per se* tying arrangement sufficient to make the District Court's directed verdict on that issue erroneous?

(2) Was there any substantial evidence from which a jury could have found a tying arrangement which was an unreasonable restraint of trade in violation of Section 1 of the Sherman Act?

(3) Did the District Court abuse its discretion in holding that the antitrust damage verdict was excessive?

## "DEALER'S DAY IN COURT ACT" APPEAL

In applicable part, the Dealer's Day In Court Act provides:

An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided*, That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.

15 U.S.C. § 1222.

"Good faith" in turn is defined in the statute as follows:

(e) The term "good faith" shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided*, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e).

■ In relation to Chrysler's appeal from the Dealer's Day In Court Act judgment, we quote and agree with the District Judge's view of the evidence as stated in his Memorandum Opinion and Order affirming this judgment. On the key issue of "coercion," the District Judge held as follows:

There was ample evidence from which the jury could find reasonably that the

defendant acted with coercion and intimidation, or threats thereof, in effectuating such termination, and evidence also that such conduct included a wrongful demand which would result in sanctions if there was not compliance with it. See *Fray v. Chevrolet Sales, Inc. v. General Motors Corp.*, C.A.6th (1976), 536 F.(2d) 683, 685–686[2], [3, 4]. Chrysler Motors, thus, is not entitled to a judgment notwithstanding the jury verdict as to this claim.

Like the District Judge, we believe that there was ample evidence, albeit vigorously disputed, from which the jury could have found, as it obviously did, that Chrysler had indulged in illegal coercion of its dealer.

■ Chrysler also claims that Kingsport's evidence pertaining to damages was insufficient to support the verdict.

During the trial, the plaintiff had called two witnesses to testify on the issue of damages. Mr. Douglas Hess testified relative to the "lost profits" theory; Mr. George Overend testified relative to the "going concern" theory. As to this argument, the District Judge said:

It was the Court's opinion that Messrs. George Overend and Douglas Hess possessed technical and other specified knowledge which would assist the jury to understand the evidence and to determine the facts in issue herein, and that each of them was qualified by skill, experience, training, and education as an expert in the pertinent field. Thus, the Court, in its discretion, properly permitted these persons to testify as experts. Rule 702, Federal Rules of Evidence; *United States v. Barker*, C.A.6th (1977), 553 F.(2d) 1013, 1024[9], [10, 11].

Before allowing the witness, Mr. Overend to testify as to the method of establishing the value of an automobile dealership, the Court found, from its own interrogation of him, that the facts and data in this particular case, upon which he based his opinions and inferences, were of a type relied upon reasonably by experts in that particular field in forming opinions or inferences upon the subject. Rule 703, Federal Rules of Evidence; 11

Moore's Federal Practice (2d ed.) VII–48–49, § 703.10[3]; *cf. United States v. Sims*, C.A.9th (1975), 514 F.(2d) 147, 149. It was for the jury to decide any weight to give to the testimony of these experts, along with all the other evidence, *United States v. Jenkins*, C.A.6th (1975), 525 F.(2d) 819, 827[20], and they were so instructed.

We have reviewed the testimony of both of these witnesses and their qualifications. We believe the District Judge was well within his discretion in allowing them to express their opinions upon what Kingsport's value or earnings would have been absent the termination of the Dodge dealership. Chrysler had every opportunity to cross-examine these witnesses and to expose to the jury any inconsistencies, inadequacies and inaccuracies in their testimony. Further, Chrysler could have presented expert witnesses of its own to dispute whether Kingsport had suffered any damage and if so, what the proper amount might be. It chose not to do so. It cannot now complain about the jury's reliance upon the only evidence on damages which was presented, namely, Kingsport's.

Like the District Judge, we see no reason to vacate the jury's verdict on the Dealer's Day In Court issue.

## THE ANTITRUST APPEAL

As noted above, plaintiff appeals from the District Judge's directed verdict on the per se tying aspect of his antitrust complaint. Plaintiff also appeals from the District Judge's grant of Chrysler's motion non obstante veredicto, said motion being based on Chrysler's assertion that there was no substantial evidence from which the jury could have found a tying arrangement which was an unreasonable restraint of trade within the rule of reason. In this respect, plaintiff asserts that the following facts and conclusions should have been deemed established by the District Court in considering the motion n. o. v.

That on January 21, 1971, the parties entered into a franchise agreement for

the sale of Dodge automobiles in Kingsport, Tennessee and in Weber City, Virginia. (pp. 66a, 409a) Kingsport Motors performed to Chrysler's satisfaction in approved facilities. (pp. 77a, 65a; 414a) Kingsport Motors did not move its Dodge dealership or do anything else justifying termination. (pp. 70a, 112a, 113a) The franchise was terminated in consequence of refusal to submit to Chrysler's demands (in combination or conspiracy with Chrysler Realty) to tie Dodge automobiles or a franchise to sell Dodge automobiles, to a Chrysler Realty facility (pp. 80a, 81a) valued at $530,000.00 with an annual rent of at least $53,000.00. (p. 262a) The tie was demanded as part of Chrysler's aggressive policy of expanding its profitable real estate operation and was one of a host of such arrangements. (Ex. 35, 440a) Chrysler was the only source of new Dodge automobiles for resale. (p. 264a) As a result of the cancellation, interstate commerce was affected "not insubstantially" in that more than $1,000,000.00 worth of merchandise per year ceased moving therein. (p. 152a) Kingsport Motors suffered heavy damage in terms of lost profits or diminution of value of its going concern. (pp. 166a, 206a).

We accept the factual portions of the statements above without accepting the interwoven legal conclusions.

The latest test authoritatively put forward by the United States Supreme Court concerning whether or not the seller exercised illegal power through a requirement that a purchaser accept a tied product was stated in *Fortner II* (*U. S. Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 620, 97 S.Ct. 861, 867, 51 L.Ed.2d 80 (1977)) as follows:

As the Court plainly stated in its prior opinion in this case, these decisions do not require that the defendant have a monopoly or even a dominant position throughout the market for a tying product. See 394 U.S., at 502–503, 89 S.Ct. at 1258–1259. They do, however, focus attention on the question whether the seller has the

power, within the market for the tying product, to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market.[13] In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product.

[13] "Accordingly, the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market." 394 U.S., at 504, 89 S.Ct. at 1259.

Professor Dam correctly analyzed the burden of proof imposed on Fortner by this language. In his article in the 1969 Supreme Court Review 25–26, he reasoned:

"One important question in interpreting the *Fortner* decision is the meaning of this language. Taken out of context, it might be thought to mean that, just as the 'host of tying arrangements' was 'compelling evidence' of 'great power' in *Northern Pacific*, so the inclusion of tie-in clauses in contracts with 'any appreciable numbers of buyers' establishes market power. But the passage read in context does not warrant this interpretation. For the immediately preceding sentence makes clear that market power in the sense of power over price must still exist. If the price could have been raised but the tie-in was demanded in lieu of the higher price, then—and presumably only then—would the requisite economic power exist. Thus, despite the broad language available for quotation in later cases, the treatment of the law on market power is on close reading not only consonant with the precedents but in some ways less far-reaching than *Northern Pacific* and *Loew's*, which could be read to make actual market power irrelevant." (Footnotes omitted.)

In *Fortner I* (*Fortner Enterprises, Inc. v. U. S. Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969)), the Supreme Court had said concerning the tied product:

"For these reasons 'tying agreements fare harshly under the laws forbidding restrains of trade.' *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 606 [73 S.Ct. 872, 879, 97 L.Ed.2d 1277]. They are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not substantial' amount of interstate commerce is affected. *International Salt Co. v. United States*, 332

U.S. 392 [68 S.Ct. 12, 92 L.Ed. 20]." (Footnote omitted.)

*Id.* at 499, 89 S.Ct. at 1256, quoting *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

█ We believe that properly analyzed, the tying products in this case are the medium priced Dodge automobiles sold by Chrysler, but that the market to be considered in relation to this tying product is the sum total of medium priced automobiles manufactured by Chrysler and all other automobile manufacturers and sold in the United States. So viewed, there does not appear to us to be any proof at all that Chrysler possessed economic power which was sufficient to "raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market." We do not find that there is proof in this record that Chrysler in this situation had any "advantage not shared by its competitors in the market for the tying product."

This record does not disclose what practices Chrysler (or other automobile companies) have in either offering help to dealers through real estate divisions or requiring that dealers accept facilities provided by real estate divisions.

We agree with appellant, of course, that market dominance is not the test to be applied in this case. We likewise agree that in *Fortner II*, the Supreme Court refined the economic power test as follows: "In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product."

As we see the matter, however, this question must be answered in context of the market as we have defined it above, namely, all medium priced cars available for sale in the United States. So defined, there is simply no proof whatever in this case that the seller had any power to raise prices or that the tying here complained of affected any appreciable number of buyers within the applicable market.

It is true, of course, that plaintiff presented evidence of a Chrysler report which indicated that in the year concerned,

Chrysler Realty was operating or leasing some 700 Chrysler dealership facilities. There is, however, no proof whatsoever tendered that these facilities have been other than voluntarily used by dealers except in the instance dealt with in this case.

Even were we to assume that defendant had the requisite economic power in the market for the tying product, the plaintiff must still demonstrate that the defendant's practices had a "not insubstantial" impact in the market for the tied product.

If we find it difficult to define a market as to the tying product, we find it doubly so in relation to the tied product. The tied product in this case must be the land and buildings contemplated in the Chrysler Realty proposal to Kingsport Motors. The market for the tied product would be that for all similar facilities. As to such land and buildings, there is certainly no proof that Chrysler Realty possessed any substantial, or for that matter, any power at all to affect price.

This record does not, aside from the coercion proofs of this case, show that Chrysler was engaged in a general (or substantial) pattern of requiring its dealers to do business with Chrysler Realty by employment of economic pressure or coercion involving the grant or withholding of Dodge or other Chrysler franchises. We, of course, note the paragraph from the 1973 Chrysler Report upon which Kingsport relies:

Chrysler Realty Corporation and
Consolidated Subsidiaries

\*   \*   \*   \*   \*   \*

During the year Chrysler Realty continued to expand its dealership program and now controls 763 dealership facilities. Development and management fees received pursuant to an agreement with Chrysler Motors Corporation for administrative services for developing and managing dealership facilities totalled $9.8 million in 1973, compared with $10.3 million in 1972. The diversified real estate program grew during the year through the continued development of projects started in earlier years and through the

acquisition of the Westwood Office Plaza in the Los Angeles area.

From this single paragraph, Kingsport seeks to extrapolate record support for a holding in this case similar to that in *United States v. General Motors Corp.*, 121 F.2d 376 (7th Cir. 1941). The *General Motors* case was a federal prosecution alleging a conspiracy between GM and General Motors Acceptance Corporation to restrain interstate trade and commerce by requiring GM dealers to finance the purchase of automobiles from GM and to finance the sale of automobiles to customers exclusively through the General Motors Acceptance Corporation by dint of cancelling franchises of dealers who failed to comply. The opinion of the court recited apparently undisputed proofs that such a policy had been adopted on a wide, if not absolute, scale. If we had such proofs in our instant case, we would be grappling with an entirely different problem.

As we see this case, we deal here with an instance, as found by this jury, of Chrysler undertaking to coerce a dealer to give up its then existing plant and pay $53,000 rent for physical facilities to be supplied by Chrysler Realty. That the coercion aspect of this case is illegal and calls for remedy, we have already established by affirming the $450,-000 judgment for Kingsport against Chrysler under the Dealer's Day In Court Act.

What we now hold is that those same proofs, absent more, do not constitute a Sherman Act violation because they do not represent a "not insubstantial" anti-competitive impact on the relevant market.

In *Davis v. Marathon Oil Co.*, 528 F.2d 395 (6th Cir. 1975), *cert. denied*, 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976), we discussed a somewhat similar tie-in between sales of gasoline and sales of tires, batteries and accessories (T.B.A.). Judge McCree's opinion said:

> However, even if Davis had shown that Marathon had required him to purchase Marathon TBA in order to retain his lease

and to purchase Marathon petroleum products, there is no evidence in the record that could support the conclusion that it was a general practice of Marathon, imposed upon many or all of its lessee-operators, to purchase its TBA as a condition of receiving petroleum products or of retaining leases. The only evidence about the experiences of other lessee-operators of Marathon was the testimony of five Marathon dealers who said that they had never been threatened with the loss of their leases if they did not purchase Marathon-sponsored TBA exclusively. The most that can be said for appellant's proofs is that they show that Day and Burocker were aggressive salesmen who were interested in increasing their sales of Marathon TBA.

> We hold that Davis clearly failed to present sufficient evidence to permit a determination that the "total volume of sales tied by the sales policy under challenge" was not "insubstantial." *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 502, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969).

Id. 332 U.S. at 402, 68 S.Ct. at 18.

Our view on this issue is strengthened by Congress' obvious intention to provide a remedy for the single dealer facing the possibility of bad faith coercion through employment of the overwhelming economic power of an automobile company like Chrysler.[1] In adopting the Dealer's Day In Court Act, Congress described its purpose thus:

### AN ACT

To supplement the antitrust laws of the United States, in order to balance the power now heavily weighted in favor of automobile manufacturers, by enabling franchise automobile dealers to bring suit in the district courts of the United States to recover damages sustained by reason of the failure of automobile manufactur-

---

[1]. We describe the economic facts of this case as of the years involved—long before Chrys-

ler's economic problems of 1980.

ers to act in good faith in complying with the terms of franchises or in terminating or not renewing franchises with their dealers.

70 Stat. 1125.

This language serves to reinforce our belief that proofs of practices causing significant impact upon a general market (beyond coercion of a small dealer) are required to invoke the sanctions of the Sherman Act whether on a per se or rule of reason basis.

The $450,000 Dealer's Day In Court Act judgment of the District Court is affirmed. The judgment of the District Court non obstante veredicto vacating the jury award in the antitrust actions is affirmed as is the District Court's dismissal of the per se count of the antitrust complaint.