**VIRTUAL MAINTENANCE, INC.,**
**Plaintiff–Appellee,**

v.

**PRIME COMPUTER, INC.,**
**Defendant–Appellant.**

Nos. 90–2249, 91–1273.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 9, 1991.

Decided Feb. 27, 1992.

Rehearing Denied April 13, 1992.

Ronald S. Katz, Janet S. Arnold, Coudert Bros., San Francisco, Cal., Rodger D. Young, argued, Jamal J. Hamood, Younng & Hamood, Southfield, Mich., for plaintiff-appellee.

Stephen F. Wasinger, Howard B. Iwrey, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., Charles Fried, argued, Cambridge, Mass., Deborah J. Hart, briefed, James C. Burling, briefed, Hale and Dorr, Boston, Mass., for defendant-appellant.

Before JONES and SUHRHEINRICH, Circuit Judges, and LIVELY, Senior Circuit Judge.

SUHRHEINRICH, Circuit Judge.

Defendant Prime Computer, Inc. ("Prime") appeals the district court's denial of its motion for judgment notwithstanding the verdict ("j.n.o.v.") or a new trial following a jury's general verdict in favor of plaintiff Virtual Maintenance, Inc. ("Virtual") in this antitrust action. The jury found that Prime's sale of certain computer software support services in conjunction with computer hardware maintenance for Prime's 50 Series minicomputers amounted to an illegal tying arrangement in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. The jury awarded Virtual $8,453,000 in compensatory damages, which the dis-

trict court trebled under the antitrust statute for a total award of $25,359,000. The district court then issued an injunction prohibiting Prime from enforcing a contract provision requiring the purchase of Prime's hardware maintenance with its software support services and declaring void any Prime hardware maintenance contracts with customers using "Ford-required CAD/ CAM applications."

Prime's appeal challenges the three alternative legal theories presented to the jury, the scope of damages awarded, and the specificity of the injunction. We conclude that Prime lacks market power in a properly defined interbrand tying product market. We further find that Prime's conduct did not have substantial anticompetitive effects in the tied product market. Therefore, the district court erred by not granting Prime's motion for j.n.o.v. Because judgment should have been entered for Prime, the award of damages and the injunction must be vacated. We REVERSE, VACATE, and REMAND with instructions to enter judgment in favor of Prime.

I

Prime manufactures and markets computer systems, distributes software, and provides hardware maintenance services for those systems. One of Prime's hardware systems is the Prime 50 Series minicomputer. In the general market for computers and software, Prime competes with companies such as IBM, UNISYS, NCR, DEC, Hewlett–Packard, and Data General. All large companies that sell computers and software provide hardware maintenance for their own computers.

Part of Prime's business is to supply companies with Computer Aided Design/Computer Aided Manufacturing Systems ("CAD/CAM") used in product design. Prime also distributes software for the CAD/CAM systems and accounts for approximately 11% of the general CAD/ CAM software sold throughout the world, making it the second largest vendor of CAD/CAM in the world.

One software design program distributed by Prime, called PDGS, was created by

Ford Motor Company ("Ford"). A general version of PDGS is widely available from other distributors. Ford licenses Prime as the exclusive distributor of a modified version of PDGS used in automotive design under a year-to-year contract. Ford frequently updates PDGS and requires all companies that provide it with design services to use the most current version of PDGS in order to facilitate translation of the designs into Ford's identical PDGS software.

Although Ford's version of PDGS runs only on Prime's 50 Series minicomputers, it can be translated to other systems at a higher cost. The Prime 50 Series computer is in use in approximately 23,000 systems worldwide. Software compatible with the 50 Series accounts for approximately 3% of the worldwide CAD/CAM market, and Ford's PDGS software accounts for an even smaller percentage of the total CAD/CAM market. Approximately 350–400 of the 23,000 Prime 50 Series computers, or about 2%, are capable of using PDGS.

In addition to distributing Ford's PDGS software, Prime distributes revisions, modifications, updates, and support services (collectively "software support") for general CAD/CAM software. Prime also distributes software support for PDGS software, offering it to Ford's design suppliers as part of a package that includes hardware maintenance on the 50 Series minicomputers. The cost of the package is $16,000 per year for each installation. Customers are free to buy the software support separately from the hardware maintenance, but the cost to purchase software support without the maintenance package varies from $80,000 to $160,000 per year for each installation.

Virtual services computer systems and provides hardware maintenance for various companies. When Virtual entered the market for hardware maintenance of Prime 50 Series computers in April 1989, it discovered Prime's practice of packaging its software support with hardware maintenance of 50 Series computers. Virtual tried unsuccessfully to enter into hardware maintenance contracts with companies that owned Prime 50 Series computers. Although some purchasers of Prime's software support desired to use Virtual's hardware maintenance, the design companies in need of the continuous software support were reluctant to switch to Virtual's hardware maintenance because of the increased price Prime charged for the purchase of software support apart from its hardware maintenance package. It is unclear how many Prime 50 Series owners do design work for Ford or how many of these owners desired to switch to Virtual for hardware maintenance. It is undisputed, however, that this number could not exceed 400 because that is the total number of 50 Series systems capable of using PDGS.

The hardware maintenance provision was included in all of Prime's CAD/CAM software support contracts. However, the general contract to purchase PDGS contained no hardware maintenance requirement. Only the frequent software updates were linked to hardware maintenance, not the initial purchase of PDGS design software. However, as noted, Prime's software support could be purchased separately only at a prohibitive cost increase over the combined software support/maintenance package.

Virtual sued Prime, claiming that Prime's marketing strategy of linking its software support with hardware maintenance on 50 Series computers amounted to an illegal tying arrangement in violation of the antitrust laws. Virtual alleged that purchase of software support for general CAD/CAM and/or Ford-required CAD/CAM software (the tying product) was conditioned on the purchase of hardware maintenance for Prime 50 Series computers (the tied product). Virtual claimed that this tie-in unlawfully restricted its ability to compete with Prime in the 50 Series hardware maintenance market.

Prior to trial, Prime moved for summary judgment claiming that there was no genuine issue of material fact regarding whether it had sufficient economic power in the market for the tying product to restrain competition appreciably in the tied product market. The district court determined that

genuine issues of material fact were present as to the definition of the relevant product market and denied Prime's motion for summary judgment. 735 F.Supp. 231 (E.D.Mich.1990). At trial, the jury found in favor of Virtual.

The district court denied Prime's motion for j.n.o.v. or a new trial and issued an injunction prohibiting Prime from continuing its practice of selling software support with hardware maintenance. This court denied Prime's motion to stay the injunction pending appeal.

## II

Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. The Supreme Court has consistently held that this provision only proscribes unreasonable restraints of trade. *See Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). Tying arrangements have long been considered unreasonable restraints of trade. *See International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); *Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (*Fortner I*).

■■■ A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product." *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Not all sales of two products together constitute an illegal tying arrangement. *Jefferson Parish Hosp. Dist., No. 2 v. Hyde*, 466 U.S. 2, 11, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). The packaging of two items together violates the antitrust laws only when a seller has sufficient market power over the tying product such that it can force buyers to purchase the tied product. *Id.* at 12, 104 S.Ct. at 1558.

■■■ A plaintiff can establish an illegal tying arrangement under either a per se standard or a rule of reason standard. To establish a per se violation: "1) There must be a tying arrangement between two distinct products or services; 2) The seller must have sufficient economic power in the tying market to restrain appreciably competition in the tied product market; and 3) The amount of commerce affected must be 'not insubstantial.'" *Directory Sales Management v. Ohio Bell Tel. Co.*, 833 F.2d 606, 609 (6th Cir.1987) (quoting *Bouldis v. United States Suzuki Motor Corp.*, 711 F.2d 1319, 1330 (6th Cir.1983)). Even if a per se violation is established, a defendant may prevail by showing a substantial business justification for the tie-in. *See, e.g., Mozart Co. v. Mercedes–Benz of North America, Inc.*, 833 F.2d 1342, 1348–51 (9th Cir.1987), *cert. denied*, 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988).

### A.

A tying arrangement clearly exists here because the large price differential between software support alone and the software support/hardware maintenance package induces all rational buyers of Prime's software support to accept its hardware maintenance. It is also clear that two separate products or services, software support and hardware maintenance, are involved in this case due to the evidence of separate consumer demand for each product. *See Jefferson Parish*, 466 U.S. at 19, 104 S.Ct. at 1561 (separate consumer demand for products is the key to determining if separate products are involved). We therefore turn to the issue of Prime's economic power in the tying product market.

### B.

■■■ The second element of a per se tying case is proof of sufficient economic power in the tying market to affect appreciably the competition in the tied market. Such economic power exists when the tying party enjoys some significant advantage in the tying product market, not enjoyed by its competitors, that enables it to condition the availability of the tying item on acceptance of the tied item. *Jefferson Parish*, 466 U.S. at 14, 104 S.Ct. at 1559; *United States Steel Corp. v. Fortner Enters.*,

*Inc.,* 429 U.S. 610, 619–20, 97 S.Ct. 861, 867, 51 L.Ed.2d 80 (1977) (*Fortner II*); *Northern Pacific,* 356 U.S. at 6, 78 S.Ct. at 518. If this market power over consumers is not present, then purchasers of the tying product can simply turn to other sources of supply, and the attempted tie will ultimately collapse for want of takers.

The market power inquiry has both a product and a geographic dimension. "Because the relevant market provides the framework against which economic power can be measured, defining the product and geographic markets is a threshold requirement." *Spectrofuge Corp. v. Beckman Instruments, Inc.,* 575 F.2d 256, 276 (5th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). The parties agree that the relevant geographic market is the entire world. Virtual submits, however, that we need not determine the relevant product market because Prime's market power is established by evidence that Prime was able to force an appreciable number of customers to submit to the tie. Virtual claims that "when 'forcing' is present ... the Sherman Act is violated." *Jefferson Parish,* 466 U.S. at 12, 104 S.Ct. at 1558.

■ Virtual is mistaken. Proof that a defendant forced a consumer to accept a tying arrangement is not alone adequate to establish an illegal tie. Rather, "forcing" is simply a proxy for determining whether the seller has conditioned the tying product on acceptance of the tied product. Evidence of "forcing" is necessary to show that a tie exists between two products, but is not sufficient to establish that the tie is illegal. Proof of such conduct does not establish per se illegality because not all ties are illegal. *Jefferson Parish,* 466 U.S. at 11–12, 104 S.Ct. at 1558. As one court explained this distinction:

> Application of the "forcing" concept confronts courts with a dilemma. Obviously a seller must have some degree of leverage or power to require buyers to accept the conditions of having to purchase the tied products: if buyers always purchased the product voluntarily, the condition would be unnecessary. But if that

leverage or power alone suffices to establish the presence of forcing and thus to invoke the per se rule, then every tying agreement would ipso facto be illegal per se. Such a result is clearly not what [*Jefferson Parish v.*] *Hyde* or earlier Supreme Court decisions intended.

*Casey v. Diet Center, Inc.,* 590 F.Supp. 1561, 1567 n. 9 (N.D.Cal.1984).

Indeed, if proof of forcing alone were sufficient to establish an illegal tie, the Supreme Court's market analysis in *Jefferson Parish* would have been superfluous. *Jefferson Parish* involved a hospital that had contracted with a certain firm to provide all of its anesthesiological services. The hospital's patients were "forced" to purchase that firm's anesthesiological services (the tied product) whenever they purchased hospital care (the tying product). Nevertheless, the Court found that the arrangement did not violate the Sherman Act. The Court indicated that the hospital had to possess market power over the tying product to be liable under a per se tying claim. *Jefferson Parish,* 466 U.S. at 25, 104 S.Ct. at 1565. Similarly, Virtual must show that Prime is able to force customers to buy its software support plus hardware maintenance *because of its market power* over the tying product. Thus evidence of "forcing" without market power over the tying product does not establish an antitrust violation.

To determine whether Prime has market power over the tying product, it is essential first to define the tying product market. The district court's definition of the relevant tying product market in its jury instructions involves the articulation of a legal standard which is then applied by the jury to the factual circumstances of each case. "Accordingly, the district court's formulation of the market tests may be freely reviewed on appeal as a matter of law; the conclusion that the relevant markets [consist of certain products] sold within specific [geographic areas] is a finding of fact subject to the clearly erroneous rule." *White & White, Inc. v. American Hosp. Supply Corp.,* 723 F.2d 495, 499–500 (6th Cir.1983). *See also Jayco Systems, Inc. v. Savin*

*Business Machs. Corp.,* 777 F.2d 306, 319 n. 43 (5th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 30 (1986); *Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 673 n. 4 (7th Cir.1985), *cert. denied,* 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986); *Seidenstein v. National Medical Enters., Inc.,* 769 F.2d 1100, 1106 (5th Cir.1985); *Systemized of New England, Inc. v. SCM, Inc.,* 732 F.2d 1030, 1035 (1st Cir.1984).

■ A market is "any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could raise prices significantly above the competitive level." *H.J., Inc. v. International Tel. & Tel. Corp.,* 867 F.2d 1531, 1537 (8th Cir.1989) (quoting Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law,* ¶ 518.1 at 311 (Supp.1987)). In *A.I. Root v. Computer/Dynamics, Inc.,* 806 F.2d 673 (6th Cir.1986), this court stated:

> The essential test for ascertaining the relevant product market involves the identification of those products or services that are either (1) identical to or (2) available substitutes for the defendant's product or service.... This comparative analysis has been characterized as the "reasonable interchangeability" standard.

*Id.* at 675 (quoting *White & White,* 723 F.2d at 500). *See also Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). The "reasonable interchangeability" standard focuses on "cross-elasticity of demand—the degree that buyers of one product switch to another in response to a price change." *H.J., Inc.,* 867 F.2d at 1538. Cross-elasticity of supply also helps define a relevant product market. Cross-elasticity of supply is the degree to which producers will enter the market to compete if prices rise. *Brown Shoe,* 370 U.S. at 325 n. 42, 82 S.Ct. at 1524 n. 42. With these principles of product market definition in mind, we turn to the district court's formulation of the relevant markets in its jury instructions.

### 1.

The district court presented the jury with two alternative definitions of the tying product market under the per se theory. The court defined these markets as: (1) "the sale of software revisions and support for the CAD/CAM industry in general," or (2) "the sale of software revisions and support for software necessary to do business with Ford Motor Company." (Joint App. at 1972). We consider each of these product market definitions in turn.

■ We find no error in the legal adequacy of the district court's first market definition. However, this market definition required the jury to find that Prime possessed power over price or "market power" in the sale of all software suitable for CAD/CAM purposes. Viewing the evidence in the light most favorable to Virtual, Prime possessed at most an 11% share of this market. This market share is insufficient to confer market power. *See Jefferson Parish,* 466 U.S. at 26, 104 S.Ct. at 1565 (30% market share insufficient to infer market power); *A.I. Root,* 806 F.2d at 675 (2–4% market share insufficient); *Grappone, Inc. v. Subaru of New England, Inc.,* 858 F.2d 792, 796 (1st Cir.1988) (5% market share insufficient). An 11% market share, standing alone, is insufficient as a matter of law to confer the "great market power, evidenced by an exceptional demand for the tying product" necessary for a per se illegal tie. *A.I. Root,* 806 F.2d at 676.

Relying on *Fortner I,* 394 U.S. at 503–04, 89 S.Ct. at 1258–59, Virtual urges that proof of power over "some appreciable number of consumers" in a market can establish market power throughout that market. This argument was rejected by the Supreme Court in *Fortner II,* 429 U.S. at 620 n. 13, 97 S.Ct. at 868 n. 13 (the inclusion of tie-in clauses with some appreciable number of buyers cannot establish market power in the absence of power to control prices throughout the market). *See also 3 P.M., Inc. v. Basic Four Corp.,* 591 F.Supp. 1350, 1360–61 (E.D.Mich.1984). Even if we accepted this argument, Prime can only control customers who desire PDGS software and PDGS accounts for less than 3% of the general CAD/CAM

market. Moreover, the fact that some of Prime's customers prefer PDGS does not enable Prime to influence competitive conditions in the general CAD/CAM market because

> virtually every seller of a branded product has *some* customers who especially prefer its product.... But to permit that fact alone to show market power is to condemn ties that are bound to be harmless.... *Jefferson Parish* convinces us that the entire court means the "market power" requirement to be serious enough to screen out this class of harmless tie.

*Grappone*, 858 F.2d at 797.

■ Therefore, a per se tying violation could not be established under the district court's first jury instruction because Prime lacks market power in the general CAD/CAM product market. Because the jury returned a general verdict when one of the theories of liability was legally incorrect, we must reverse. *See Maryland v. Baldwin*, 112 U.S. 490, 493, 5 S.Ct. 278, 279, 28 L.Ed. 822 (1884); *Wilmington Star Mining Co. v. Fulton*, 205 U.S. 60, 79, 27 S.Ct. 412, 419, 51 L.Ed. 708 (1907); *United New York and New Jersey Sandy Hook Pilots Association v. Halecki*, 358 U.S. 613, 619, 79 S.Ct. 517, 520, 3 L.Ed.2d 541 (1959); *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 29–30, 82 S.Ct. 1130, 1135–36, 8 L.Ed.2d 305 (1962).

Ordinarily, we would remand this case for a new trial. *Cf. Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050 (6th Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984). However, a new trial is unnecessary here because the evidence presented is insufficient to establish an antitrust violation by Prime in any conceivable product market. We therefore turn to the district court's second proffered tying product market instruction.

### 2.

■ Prime contends that the second market instruction defined the tying product market too narrowly as a matter of law. Prime claims that the market defini-

tion of "Ford-required CAD/CAM" must fail because this market is limited to PDGS, a single manufacturer's brand of software. We agree.

"The antitrust laws were enacted for the protection of *competition*, not *competitors.*" *Atlantic Richfield Co. v. U.S.A. Petroleum Co.*, 495 U.S. 328, 338, 110 S.Ct. 1884, 1891, 109 L.Ed.2d 333, 346 (1990) (quoting *Brown Shoe*, 370 U.S. at 320, 82 S.Ct. at 1521). Consequently, "interbrand competition among manufacturers of the same generic product ... is the primary concern of antitrust law." *Continental T.V., Inc. v. G.T.E. Sylvania, Inc.*, 433 U.S. 36, 52 n. 19, 97 S.Ct. 2549, 2558 n. 19, 53 L.Ed.2d 568 (1977); *accord Business Electronics*, 485 U.S. at 724–25, 108 S.Ct. at 1519–20; *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.*, 854 F.2d 802, 809–10 (6th Cir.1988). Courts therefore consistently reject market definitions limited to a single manufacturer's products because such markets do not reflect interbrand competition. *See, e.g., International Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904, 908 (6th Cir.1989), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1783, 108 L.Ed.2d 784 (1990); *H.J., Inc.*, 867 F.2d at 1538; *Grappone*, 858 F.2d at 797; *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 428–30 (D.C.Cir.), *cert. denied*, 479 U.S. 851, 107 S.Ct. 181, 93 L.Ed.2d 116 (1986); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488–89 (5th Cir. 1984); *Telex Corp. v. IBM Corp.*, 510 F.2d 894, 917 (10th Cir.), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1979).

Virtual attempts to avoid this authority by claiming that Ford's preference for Prime's software can define the relevant market. Virtual claims that "Ford-required CAD/CAM" is not a single brand market because Ford requires four brands of CAD/CAM software: Primos, Primenet, CAADS and PDGS. While Prime manufactures three of these products, Ford makes one itself. Therefore, Virtual submits that defining the market by Ford's requirements does not create a single brand market because Ford requires more than one brand.

Even giving Virtual every inference, we conclude that a market defined by three Prime products and one Ford product is unduly narrow. The flaw in such a market definition is that it is based solely on one customer's requirements. This court has held that a single customer's ultimate preference for a particular manufacturer's brand does not create a separate product market. *International Logistics*, 884 F.2d at 804; *Dunn & Mavis, Inc. v. NU–Car Driveway, Inc.*, 691 F.2d 241 (6th Cir.1982). Other courts are in accord. *See Neumann*, 786 F.2d at 429; *Jayco*, 777 F.2d at 320; *Domed Stadium*, 732 F.2d at 489; *General Business Systems v. North American Philips Corp.*, 699 F.2d 965, 975 (9th Cir.1983).

■ Virtual seeks to distinguish these cases by pointing out that Ford is not the only customer of Prime's products; rather, all of Ford's design suppliers make up the customer market for "Ford-required CAD/CAM." This ignores the fact that Ford requires its suppliers to purchase the software updates for Ford's benefit. Ford is ultimately the single consumer of its specialized design software because Ford's requirements define the demand for the software and the updates. But defining the market by Ford's requirements creates the appearance of market power based only upon the demand side of the market. Defining a market, or "submarket," on the basis of demand considerations alone is erroneous because such an approach fails to consider the supply side of the market. Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 518.1g at 471 & n. 26 (Supp.1990) (citing *United States v. Central State Bank*, 817 F.2d 22 (6th Cir. 1987)). The relevant product market cannot be determined without considering the cross-elasticity of supply.

■ Virtual contends that Prime has no supply side competition because it has an exclusive license for PDGS and thus only Prime can market the software updates for PDGS. This argument confuses the tying product (software support for PDGS) with the interbrand market relevant for antitrust analysis. This court previously has

refused to ignore interbrand competition by limiting the product market to one manufacturer's product. *See A.I. Root*, 806 F.2d at 675–76; *Kingsport Motors, Inc. v. Chrysler Motors Corp.*, 644 F.2d 566 (6th Cir.1981). As we stated in *Kingsport:*

> We believe that properly analyzed, the tying products in this case are the medium priced Dodge automobiles sold by Chrysler, but that the market to be considered in relation to this tying product is the sum total of medium priced automobiles manufactured by Chrysler and all other automobile manufacturers and sold in the United States.

*Id.* at 571. In the present case, the relevant tying product market is comprised of all CAD/CAM software reasonably interchangeable with PDGS.

■ Virtual claims that PDGS constitutes a relevant "submarket" because of evidence that Prime was able to raise prices in this "submarket." Evidence of short-term price increases in an intrabrand "submarket" does not defeat the theory of supply substitution. The Ninth Circuit rejected such an argument in *General Business Systems*, 699 F.2d at 974–77. In that case, the court held that a computer manufacturer could not sustain high prices in the derivative markets for computer service and warranty protection because it lacked market power in the primary interbrand market for small business computers. *Id.* at 977. The same rationale was applied by this court in *A.I. Root*, 806 F.2d at 675–76, where we found that "competitors of [defendant] could produce computer hardware and software equivalent to that manufactured by [defendant]. Accordingly, [defendant's product] did not compose a separate and distinct submarket within the computer industry as to which we should measure 'market share.'"

■ The same is true in this case. Prime has market power in the trivial sense that no one else makes PDGS. But true market power—power sufficient to charge and sustain anticompetitive prices—cannot be inferred from this because were Prime to charge exorbitant prices for its software support, its customers would simply switch

to some other manufacturer of PDGS-type software. Prime's lack of market power over the general market for CAD/CAM software thus prevents Prime from controlling the "submarket" for PDGS software. *See Brown Shoe,* 370 U.S. at 325, 82 S.Ct. at 1523; *A.I. Root,* 806 F.2d at 676; *General Business Systems,* 699 F.2d at 977.

■ Virtual responds that Ford and its design suppliers cannot switch to a new supplier of software support because they are "locked-in" to Prime as the sole supplier due to their substantial investments in Prime 50 Series computers and other hardware. While Ford might believe it is "locked-in," this is due in large part to its own decision to purchase Prime's software and invest in Prime's computer systems. But a customer's initial purchase of a particular manufacturer's product does not justify a limited market definition. Defining the market by customer demand *after* the customer has chosen a single supplier fails to take into account that the supplier (here Prime) must compete with other similar suppliers to be designated the sole source in the first place. *Neumann,* 786 F.2d at 429. As noted in Philip E. Areeda, *Antitrust Law,* ¶ 1709c5 at 102 (1991):

> Notwithstanding some element of truth in the "lock in" contention, it misconceives the purpose of the legal inquiry into power. In the tying context, we want to know whether power in the tying-product market forced the [plaintiff] to agree to take the unwanted second product. It follows that we should measure the tying seller's power at the time that the tie-in agreement came into existence. At that time, the [plaintiff] has not yet invested the capital or effort that later makes him reluctant to abandon [defendant's product]. Indeed, at that time, the plaintiff presumably had many market alternatives.

Given the intense competition in the general market for computers and software, Ford presumably had many companies to choose from prior to purchasing Prime's equipment.

Numerous cases have rejected the "lock-in" theory as a viable basis for antitrust liability when there is a potential for a reasonable interchangeability of supply. *See, e.g., General Business Systems,* 699 F.2d at 974 n. 2 ("Whether real or only potential, reasonable interchangeability of supply is significant because the existence of possible competitors constrains prices even when there is no direct competition."); *Cal. Computer Products, Inc. v. IBM Corp.,* 613 F.2d 727, 739–43 (9th Cir.1979); *Telex,* 510 F.2d at 919. It is undisputed that IBM, Data General and other competitors of Prime have contacted Ford about supplying PDGS software and updates for Ford and Ford's designers. Ford itself has tried to make PDGS compatible with hardware other than the Prime 50 Series. There exists at least a potential for a reasonable interchangeability of supply.

Even if we accepted Virtual's lock-in argument, it seems unlikely that a large consumer like Ford would be "locked-in" by Prime when Ford controls the license to PDGS. The lock-in theory is viable only when the producer can charge its customer monopoly prices without fear of being replaced by competitors due to the customer's substantial investments. Ford's control of the product it is allegedly being forced to buy precludes Prime from maintaining the market share necessary to charge monopoly prices. Market power cannot be sustained absent the ability to maintain market share. *United States v. Syufy Enterprises, Inc.,* 903 F.2d 659, 665–66 (9th Cir.1990) ("It is not market share that counts, but the ability to maintain market share.").

Virtual next argues that Prime's market power was established by the "uniqueness" of the PDGS software. The Supreme Court has held that the uniqueness of a product can establish market power in tying cases. *Fortner II,* 429 U.S. at 612, 97 S.Ct. at 863. However, the Court held as a matter of law that mere factual uniqueness was not enough. In order to establish market power by showing a unique package, a plaintiff must prove that "the seller has some advantage not shared by his competitors in the market for the tying product." *Id.* at 620, 97 S.Ct. at 867. "In other

words, the plaintiff must show a barrier to entry that prevents competition. If rivals may design and offer a similar package for a similar cost, there is no barrier, and without a barrier there is no market power." *Will*, 776 F.2d at 672. "Uniqueness means the *inability* of a seller's rivals to offer similar packages, not simply the fact that no rival has chosen to do so." *Spartan Grain & Mill Co. v. Ayers*, 735 F.2d 1284, 1287 (11th Cir.1984), *cert. denied*, 469 U.S. 1109, 105 S.Ct. 785, 83 L.Ed.2d 779 (1985).

■ Virtual contends that substantial entry barriers prevent competitors from entering the market for "Ford-required CAD/CAM." The barriers are mainly high entry costs, high investment costs in equipment to produce the software, and Ford's exclusive license with Prime. However, there was substantial evidence that large companies such as IBM, DEC, and Data General already possess the production capacity and facilities to develop software for Ford within one year. All competitors are interested in having a large customer such as Ford and thus market power is not created by the year-to-year exclusive licensing of PDGS. The notion that Prime can charge anticompetitive prices rests on the suspect assumption that Ford is willing to pay greatly increased costs to its design suppliers, who will pass any price increase in software on to Ford. Even giving Virtual every inference, a jury verdict in an antitrust case that ignores economic reality cannot stand. *Matsushita Elec. Indus. Co. v. Zenith Radio Co.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ Virtual claims that Prime's exclusive license is a significant barrier to entry into the PDGS market that enhances PDGS's uniqueness. This court has held that a copyright for BOSS software did not make equipment using such software a unique product. *A.I. Root*, 806 F.2d at 676–77. Because the presumption of market power for copyrights was based on the uniqueness of the copyrighted material, any curtailment of the presumption of market power from copyrights necessarily limits the use of the uniqueness test as a shortcut to a finding of economic power.

*See Jefferson Parish*, 466 U.S. at 37 n. 7, 104 S.Ct. at 1571 n. 7 (O'Connor, J., concurring). *A.I. Root* precludes reliance on the uniqueness of a long term copyright to find market power. Therefore, a finding of uniqueness from a mere one year exclusive license is foreclosed. *A.I. Root*, 806 F.2d at 676–77; *3 P.M., Inc.*, 591 F.Supp. at 1358–59. This is especially true when there is evidence that other barriers to entry, at least with large competitors like IBM, are low on the supply side.

We conclude that the district court erred by allowing Virtual's proposed "Ford-required CAD/CAM" market instruction to go to the jury. Such an instruction is too narrow as a matter of law because it defines the tying product market only by demand considerations. In a properly defined tying product market, Prime lacks the market power necessary to commit a per se illegal tie. We therefore next address whether substantial evidence supports a determination that Prime committed illegal tying under the rule of reason.

### C.

■ When, as here, a seller does not possess the market power that enables it to force customers to purchase a second product as a condition to obtaining the tying product, an antitrust violation for tying can nonetheless be established by evidence that the tie is an unreasonable restraint on competition in the market for the tied product. *Jefferson Parish*, 466 U.S. at 18, 104 S.Ct. at 1561; *Hand v. Central Transport, Inc.*, 779 F.2d 8, 10–11 (6th Cir.1985) (per curiam); *Davis–Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1196 (6th Cir. 1982). Under the rule of reason a plaintiff must show not only that a restraint exists but that it actually has anticompetitive effects in an interbrand market. *Crane & Shovel*, 854 F.2d at 809. Prime correctly notes that the Supreme Court would analyze this type of tying claim like "any exclusive-requirements contract." *Jefferson Parish*, 466 U.S. at 30 n. 51, 104 S.Ct. at 1568 n. 51.

Under exclusive dealing principles, foreclosure of hardware maintenance customers to Virtual by Prime's tie-in becomes unreasonable only when a significant portion of all available purchasers are foreclosed by the exclusive conduct. *Id.* at 30–31, 104 S.Ct. at 1567–68; *see generally Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 333–34, 81 S.Ct. 623, 630–31, 5 L.Ed.2d 580 (1961). Virtual did not produce evidence of a significant amount of foreclosure due to the tie-in in the tied product market for computer hardware maintenance.

Nor can Virtual limit the definition of the tied product market to hardware maintenance of Prime 50 Series computers simply because it desires to service only Prime's systems. Markets are defined by ease of supply and demand substitution, not by one competitor's business preferences. *See, e.g., Dunn & Mavis*, 691 F.2d at 243; *Spectrofuge Corp.*, 575 F.2d at 282; *Telex*, 510 F.2d at 917. Hardware maintenance of Prime's computers is similar to servicing other minicomputers. Thus companies performing hardware maintenance on the Prime 50 Series can easily switch to maintenance of other computers. The market extends beyond hardware maintenance of Prime's 50 Series because hardware maintenance skills are easily transferable. *See Spectrofuge Corp.*, 575 F.2d at 283.

Virtual claims that a jury could reasonably find that Prime possessed almost total control over the Prime 50 Series hardware maintenance market. This mistakenly assumes that the tied product market is limited to Prime's own system. The flaws of this analysis have been discussed above. The relevant tied product market is computer hardware maintenance in general.

Even assuming that Prime had market power over consumers of its own brand of software, Prime's tie foreclosed competition for hardware maintenance of at most the 400 50 Series systems capable of using PDGS. *See Hand*, 779 F.2d at 11 ("A defendant must have market power [over the tying product] before its conduct can be shown to have an adverse effect on competition [in the tied product market].")．The foreclosure of 400 computer systems out of

the thousands of systems in the worldwide market for computer hardware maintenance is insignificant as a matter of law. Consequently, Prime's tie-in did not have anticompetitive effects in the general hardware maintenance market. "Without a showing of actual adverse effect on competition, [Virtual] cannot make out a case under the antitrust laws, and no such showing has been made." *Jefferson Parish*, 466 U.S. at 31, 104 S.Ct. at 1568. There is insufficient evidence to support the jury verdict under the rule of reason.

## III

The judgment of the trial court is reversed because it is based upon an erroneous determination of the fundamental issue of relevant product market. A j.n.o.v. is entered for Prime because the facts presented show that Prime lacks market power in the interbrand market for general CAD/CAM software. Moreover, there is no proof that Prime's conduct had a substantial anticompetitive effect in the general market for computer hardware maintenance. Therefore, the award of damages and the injunction are vacated. For the foregoing reasons, we REVERSE, VACATE, and REMAND with instructions that judgment be entered in favor of Prime.