

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-2-1998

# Brokerage Concepts v. US Healthcare Inc (Part I)

Precedential or Non-Precedential:

Docket 96-1891,96-1922,96-1923,96-1892,97-1013,97-1014

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Brokerage Concepts v. US Healthcare Inc (Part I)" (1998). *1998 Decisions.* Paper 65.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/65

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Volume 1 of 2

Filed April 2, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 96-1891, 96-1892, 96-1922, 96-1923
97-1013, and 97-1014

BROKERAGE CONCEPTS, INC.

v.

U.S. HEALTHCARE, INC.; CORPORATE HEALTH
ADMINISTRATORS, INC.; UNITED STATES HEALTH CARE
SYSTEMS OF PENNSYLVANIA, INC., d/b/a THE HEALTH
MAINTENANCE ORGANIZATION OF PENNSYLVANIA;
RICHARD WOLFSON; SCOTT MURPHY;
WILLIAM BROWNSTEIN

Richard Wolfson, Scott Murphy and William Brownstein,
Appellants in No. 96-1891

U.S. Healthcare, Inc.; United States Health Care Systems
of Pennsylvania, Inc., d/b/a The Health Maintenance
Organization of Pennsylvania and Corporate Health
Administrators, Inc.
Appellants in No. 96-1892

U.S. Healthcare, Inc.; Corporate Health Administrators, Inc.;
United States Health Care Systems of Pennsylvania, Inc.,
d/b/a The Health Maintenance Organization of
Pennsylvania; Richard Wolfson; Scott Murphy; William
Brownstein,
Appellants in No. 96-1922

Brokerage Concepts, Inc.,
Appellant in No. 96-1923

U.S. Healthcare, Inc.; United States Health Care Systems of
Pennsylvania, Inc., d/b/a The Health Maintenance
Organization of Pennsylvania and Corporate Health
Administrators, Inc.,
Appellants in No. 97-1013

Richard Wolfson; Scott Murphy; and William Brownstein,
Appellants in No. 97-1014

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 95-cv-01698)

Argued: July 22, 1997

Before: BECKER, MANSMANN, and ROSENN,
Circuit Judges.

(Filed April 2, 1998)

DAVID H. MARION, ESQUIRE
FRANCIS P. NEWELL, ESQUIRE
HOWARD J. BASHMAN, ESQUIRE
PATRICK T. RYAN, III, ESQUIRE
Montgomery, McCracken, Walker &
 Rhoads, LLP
123 So. Broad Street
Philadelphia, PA 19106

Counsel for Richard Wolfson, Scott
Murphy and William Brownstein

PATRICK W. KITTREDGE, ESQUIRE
LISA G. MILLER, ESQUIRE
Kittredge, Donley, Elson,
 Fullem & Embick, LLP
421 Chestnut Street, 5th Floor
Philadelphia, PA 19109

ROBERT E. BLOCH, ESQUIRE
        ROY T. ENGLERT, JR., ESQUIRE
         (ARGUED)
        DONALD M. FALK, ESQUIRE
        ROBERT L. BRONSTON, ESQUIRE
        Mayer, Brown & Platt
        2000 Pennsylvania Avenue,
         NW
        Washington, DC 20006-1882

        Counsel for U.S. Healthcare, Inc.,
        Corporate Health Administrators,
        United States Health Care Systems
        of Pennsylvania, Inc. d/b/a The
        Health Maintenance Organization of
        Pennsylvania

        RICHARD L. BAZELON, ESQUIRE
         (ARGUED)
        A. RICHARD FELDMAN, ESQUIRE
        Bazelon & Lees
        1515 Market Street, 7th Floor
        Philadelphia, PA 19102

        Counsel for Brokerage Concepts, Inc.

OPINION OF THE COURT

BECKER,* Chief Circuit Judge.

_____

* Honorable Edward R. Becker, United States Circuit Judge for the Third Circuit, assumed Chief Judge status on February 1, 1998.

TABLE OF CONTENTS

I. INTRODUCTION                                                    5

II. FACTS & PROCEDURAL HISTORY                                     11
 A. The Parties                                                    11
 B. Gary's Decision to Self-insure                                 12
 C. Gary's Switch to CHA/U.S. Healthcare                           16
 D. Economic Evidence                                             19
  1. Impact on Gary's                                              19
  2. Knowlton's Survey                                             20
  3. Interaction Between U.S. Healthcare and
        Other Pharmacy Operations                                  20
  4. The Setting of Reimbursement Prices                           21
 E. The Jury Verdict                                               22

III. THE ANTITRUST ISSUES                                          23
 A. Introduction -- Characterization of BCI's  Claim               23
 B. Per se Liability                                               27
  1. Defining the Relevant Market                                  28
   a. The Product Market                                           29
   b. The Geographic Market                                        32
  2. U.S. Healthcare's Power in the Tying  Market                  33
   a. Evidence of Market Share                                     34
   b. Other Factors Bearing on Market Power                        37
 C. The Rule of Reason Claim                                       40
 D. Conclusion                                                     42

IV. CIVIL RICO                                                     42
 A. Introduction                                                   42
 B. RICO Standing                                                  43
 C. Predicate Acts of BCI's RICO Claim                             45
  1. Extortion under the Hobbs Act                                 45
   a. The Definition of "wrongful".                                48
   b. Lawful Versus Unlawful Claims to Property                    51
   c. Evidence of Other Unlawful Objectives                        56
  2. Commercial Bribery                                            58
  3. Mail and Wire Fraud                                           60
  4. The Travel Act                                                61
 D. Conclusion                                                     61

V.  TORTIOUS INTERFERENCE                              62

VI. CONCLUSION                                         73

I. INTRODUCTION:

The revolutionary changes in the health care field over the past decade have spawned many novel market arrangements. Perhaps the most significant development is the ascendency of managed-care driven health maintenance organizations ("HMOs"), whose hold over a large number of subscribers has permitted them to wield considerable economic power over health care providers. This antitrust, civil RICO, and state law tortious interference case against defendant U.S. Healthcare, one of the nation's largest HMO's, two of its wholly-owned subsidiaries, and three of its top officers, is an exemplar of the legal fallout from this development.

This appeal presents several quite difficult and important first impression questions for us, including: (1)  whether the defendants' use of economic fear in the context of hard business bargaining constitutes wrongful conduct amounting to extortion for civil RICO purposes; (2)  whether the inability of the plaintiff to prevail on antitrust and extortion-based civil RICO claims forecloses a successful state law tortious interference claim based on the same facts; and (3) whether the defendants' hard bargai ning constituted "wrongful means" so as to forfeit the defense of privileged business competition to a tortious interference claim.

The lawsuit emanates from U.S. Healthcare's refusal to approve the application of a new Abington, Pennsylvania store of "I Got It at Gary's" ("Gary's"), a small southeastern Pennsylvania pharmacy, health and beauty aid chain, for membership in U.S. Healthcare's network of medical prescription providers. U.S. Healthcare conditioned membership in its provider network on Gary's agreement to discontinue its contractual relationship with plaintiff Brokerage Concepts, Inc. ("BCI"), a health care consulting firm whose specialty is serving as a Third Party Administrator ("TPA") for health benefit self-insurers (such

5

as Gary's), and to give its TPA business to a U.S. Healthcare subsidiary, Corporate Health Administrators ("CHA").

U.S. Healthcare also applied pressure on Gary's in other ways -- through "hard-ball" negotiation tactics, which deliberately left Gary's "hanging" as to whether its new application would be approved, and a seemingly vindictive audit of Gary's generic prescription drug dispensing policy at one of its stores that was already part of the U.S. Healthcare network. Since U.S. Healthcare subscribers constituted a significant portion of its customer base, Gary's understandably yielded to the pressure and gave its TPA business to CHA. BCI thereupon sued in federal district court asserting Sherman Act and civil RICO claims, as well as a claim of tortious interference with contractual relations under Pennsylvania law. BCI sought compensatory and treble damages, injunctive relief, and counsel fees on its antitrust and civil RICO claims, and compensatory and punitive damages on its state law tortious interference claim. Gary's is not a party to the lawsuit.

The case proceeded to trial before a jury, which rendered a verdict finding U.S. Healthcare and its officers liable to BCI on all of BCI's claims, and awarding compensatory and punitive damages. On post-trial motions, the district court upheld the verdict but ruled that: (1) BCI must elect between the punitive damages awarded on its state law claim and the treble damages awarded on its federal claims (i.e., that it cannot recover both); and (2) if it elects the state law remedies, BCI cannot also collect the attorney's fees that are available under its RICO and antitrust claims. The defendants' appeal of the district court's denial of its post-verdict motion for judgment as a matter of law or, in the alternative, for a new trial, attacks the jury verdict on all fronts, asserting that the verdict is tainted by erroneous evidentiary rulings and jury instructions, and also that there is insufficient evidence to sustain any of the claims under proper instructions. BCI cross-appeals, contending that, under Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 218-19 (3d Cir. 1992), the district court erred in requiring BCI to elect which remedies it will recover, and also in refusing to award injunctive relief to BCI under either RICO or the antitrust laws.

6

Because all three of BCI's claims are grounded upon U.S. Healthcare's leveraging of its economic power, and because, under the jury instructions given by the district court, the RICO and state law claims may depend on the existence of a viable antitrust claim, the threshold doctrinal battleground has been over antitrust law. This aspect of the case is quite complex, not because of the need for sophisticated economic analysis or the resolution of any close or cutting-edge trade regulation issue, but rather because of the difficulty of attempting to shoehorn into the traditional antitrust model a claim that resists such characterization.

The matter was presented to the district court primarily as a tying case, under which a plaintiff can assert both a per se and a "rule of reason" claim. In a typical tying case, a seller leverages its market power in the market for the tying product to require the buyer of the product to purchase an unwanted product in the tied market, thereby (unlawfully) foreclosing competition in that market. But Gary's, the party who has been "put upon," is a seller, not a buyer, in the tying product market: when U.S. Healthcare accepts Gary's into its network of providers, what Gary's gains is the opportunity to sell drugs to U.S. Healthcare subscribers. The defendants, in contrast, contend that the case is better viewed as one of reciprocal dealing which, they submit, carries with it less stringent antitrust standards.

As will appear, our disposition of BCI's antitrust claim will take us through a number of layers of analysis, dealing with both its per se and rule of reason claims, and in the course thereof treating such matters as product market definition (and the applicability vel non of the decision in Eastman Kodak Co. v. Images Technical Servs., 504 U.S. 451 (1992)); geographic market definition (and the lack of utility of a flawed market survey in identifying the market); and above all, with the sufficiency of the record evidence (including the inferences which can be drawn therefrom) to support a legally viable antitrust claim. In the end, we conclude that, since the record before us does not support a finding that U.S. Healthcare exercised appreciable market power in a properly defined tying market, or that the

7

arrangement at issue harmed competition in the tied market, the antitrust jury verdicts on both the per se and the rule of reason claims must be set aside.

In support of its civil RICO claim, BCI alleges a variety of predicate acts, as a civil RICO claim requires. Although we deal with all of the predicate acts invoked, rejecting defendants' contention that BCI lacks RICO standing, the only acts that arguably could come within RICO's ambit are alleged extortionate acts by the defendants. Under the Hobbs Act, 18 U.S.C. S 1951, "[e]xtortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. S 1951(b)(2). The "fear" may be of economic loss as well as of physical harm. See United States v. Addonizio, 451 F.2d 49, 72 (3d Cir. 1972). In this case, the evidence is clear that U.S. Healthcare employed economic leverage in an effort to force Gary's to chose CHA as its TPA. However, while BCI contends that this conduct amounts to extortion through the wrongful use of the fear of economic loss, defendants assert that the conduct is merely hard business bargaining that cannot be made to fit within the statutory framework of Hobbs Act extortion.

As will be shown, resolution of BCI's extortion claim turns on whether the defendants' use of economic fear in the context of hard business bargaining was legally wrongful, an issue with which we have not previously had occasion to deal. We conclude that the "claim of right" defense to extortion (i.e., a defense based on a lawful claim to the property obtained by the allegedly extortionate acts) formulated by the Supreme Court in United States v. Enmons, 410 U.S. 396 (1973), is applicable in cases, such as this one, which involve solely the allegation of the use of economic fear in a transaction between two private parties. In so concluding, we are mindful of, and address, those cases that reject the broad application of Enmons outside of the labor context in which it arose for fear that it would "effectively repeal the Hobbs Act." See United States v. Agnes, 753 F.2d 293 (3d Cir. 1985).

Having determined that the claim of right defense is available to the defendants in this case, we address the difficult problem of separating out lawful from unlawful

8

claims to property. We make no effort to announce any broad principles in this difficult area. Drawing instruction from Enmons and Viacom Int'l v. Icahn, 747 F. Supp. 205 (S.D.N.Y. 1990), we make a rule only for a very narrow subset of the potential universe of extortion cases: one involving the accusation of the wrongful use of economic fear where two private parties have engaged in a mutually beneficial exchange of property. We conclude that BCI's extortion claim can only survive if Gary's had a right to pursue its business interests free of the fear that it would be excluded from U.S. Healthcare's provider network. Albeit with misgivings, we find that since Pennsylvania, unlike other states, has no "Any Willing Provider" law that compels HMOs to allow all interested and minimally qualified providers into their network, BCI had no such right. If such a law was in force, Gary's would have had a legal entitlement to be a member of the provider network and thus to be free of the fear that it would be excluded from that network if it did not switch TPA providers. Having determined that BCI did not present a sustainable case of extortion, or establish any of the other predicate acts alleged, we set aside the jury verdict as to the civil RICO count.

That BCI's federal claims have fallen is not, however, the end of its case. BCI also alleges the defendants unlawfully and improperly interfered with its existing and prospective contractual relations with Gary's in violation of Pennsylvania tort law. While BCI must prove a number of things to prevail on a tortious interference claim under Pennsylvania law, only one is in serious dispute here. The battleground is over Restatement (Second) of Torts S 768 which sets forth a competitors privilege, and in fact over only one facet of that section, S 768(1)(d), which withdraws immunity from liability if the competitor employs "wrongful means." The Pennsylvania Supreme Court has yet to define that term and hence we must predict how it would do so to resolve this case.

The parties' debate in this area was focused primarily on whether Pennsylvania would limit wrongful means to conduct that is independently actionable. While the parties have ably briefed that point, the disposition of BCI's claim

9

does not require us to resolve it. Rather, we conclude, based upon a passage from S 768 comment (e), that even if the Pennsylvania Supreme Court were to require independently actionable means, it would not apply that requirement in cases, such as this one, where the defendant exerted "economic pressure" or "a superior power" in a market unrelated to the competitive market. Here, BCI proffered ample evidence from which a jury could conclude that U.S. Healthcare attempted to acquire Gary's TPA business by threatening Gary's with withdrawal of membership in the U.S. Healthcare provider network, an unrelated market. BCI also adduced evidence of heavy-handed tactics by U.S. Healthcare in that market for pharmacy customers.

In addition to our analysis of the substance of Pennsylvania tort law, we address defendants' more fundamental argument that tort liability is not appropriate here. The crux of that argument is that BCI's tort claims are predicated on the same conduct that underlie its federal claims, and that the law should therefore not permit BCI to repackage these failed claims as tortious interference. As will be shown, in our view, BCI has attempted just the opposite. That is, it has taken conduct that constitutes tortious interference with contractual relations and has attempted to turn it into a violation of both federal antitrust and racketeering laws. While these attempts have been frustrated on this appeal, that result does not foreclose BCI's state law claim. BCI's tortious interference claim does not require proof of criminal conduct as does its extortion claim, nor is it anchored in the same kind of market based considerations as is its antitrust claim. We see no need for congruence between federal antitrust law, which is designed to protect competition and free access to markets, and state business tort law, which is designed to protect competitors.

Notwithstanding this conclusion, the tortious interference verdict cannot stand, and a new trial on the tort claims is necessary, because the jury instructions permitted the jury to find tortious interference based on antitrust and/or civil RICO violations which, we have concluded, did not exist. Hence, while we reverse outright on the antitrust and civil

10

RICO claims, we will remand the tortious interference claims for a new trial. We intimate no view on the question whether defendants' behavior was outrageous enough to justify an award of punitive damages under Pennsylvania law; that will be for determination on remand. Since the antitrust and RICO claims are out of the case, we also need not address the question of the propriety of injunctive relief for either RICO or antitrust claims, or the interesting issues posed by the cross-appeal.

II. FACTS & PROCEDURAL HISTORY

A. The Parties

BCI serves as a TPA for employers who wish to self-insure for their health benefits and other insurance needs. In this capacity, BCI designs the employer's self-insured benefit plan and usually recommends a health services provider network. The providers in the network then supply the health care, and BCI reviews and processes the resulting claims for the employer. In addition, BCI typically helps the employer purchase "stop-loss" insurance policies that cap the employers' exposure for large individual and aggregate claims. BCI also serves as an insurance broker for employees who choose to purchase fully-insured policies.

U.S. Healthcare develops, owns, operates, and markets HMOs in many states in the eastern United States, including Pennsylvania and New Jersey. These HMOs are operated by wholly owned subsidiaries, including defendant United States Healthcare Systems of Pennsylvania, Inc., d/b/a The Health Maintenance Organization of Pennsylvania ("HMO PA"), which operates as U.S. Healthcare's HMO for Pennsylvania. As of December 31, 1994, U.S. Healthcare and its subsidiaries had approximately 1,695,000 subscribers enrolled in its insured plans.

CHA is also a wholly owned subsidiary of U.S. Healthcare. It is a TPA, and provides the same type of services for self-insured employers as does BCI. In the geographic areas in which U.S. Healthcare operates an

11

HMO, CHA utilizes only the U.S. Healthcare network of doctors and hospitals. Similarly, U.S. Healthcare bars all TPAs other than CHA access to its network. At all times relevant to the present dispute, defendant Richard Wolfson was the Director of Pharmacy Programs and the Chairman of the Board of U.S. Healthcare, defendant William Brownstein served as the Regional Pharmacy Director for Pennsylvania, and defendant Scott Murphy was the Senior Vice President of U.S. Healthcare, and the senior marketing executive for CHA. We will at times refer to U.S. Healthcare, CHA, and HMO PA collectively as the "corporate defendants," and Wolfson, Brownstein and Murphy collectively as the "individual defendants."

B. Gary's Decision to Self-insure

U.S. Healthcare has established a network of health care providers which includes doctors, hospitals, and pharmacies in various geographic regions. Under the U.S. Healthcare prescription purchase program, individuals who enroll as subscribers in U.S. Healthcare's HMOs select one pharmacy from the network of providers at which they will purchase prescription drugs. Subscribers can change their pharmacy designation by filling out a form. Under this program, subscribers can purchase their prescription drugs for a small co-payment (such as $5.00), with the rest of the cost of the prescription reimbursed to the pharmacy by U.S. Healthcare. In addition, U.S. Healthcare pays the pharmacies that serve the prescription purchase plan a set monthly amount based on the number of U.S. Healthcare subscribers designating that pharmacy, without regard to the actual purchases of drugs from that pharmacy. Because subscribers seldom purchase prescription drugs from pharmacies other than those within the network, membership in the U.S. Healthcare network is highly coveted.

In 1991, Eagleville Pharmacy, Incorporated, d/b/a/ I Got It At Gary's ("Gary's") was a pharmacy chain of four stores in suburban Philadelphia. All four stores served as approved providers in the U.S. Healthcare pharmacy network. At this time, Gary's offered its full-time employees two options for their health insurance coverage: a Blue

12

Cross/Blue Shield plan and a U.S. Healthcare HMO. Approximately 35 Gary's employees enrolled as U.S. Healthcare members. In 1991, to save costs, Gary's decided to terminate its relationship with Blue Cross/Blue Shield and U.S. Healthcare, and to self-insure.

In need of a TPA to process its claims, Gary's evaluated several contenders, and then entered a written contract with BCI, terminable upon 30 days prior written notice. Sandra Chen, the benefits manager at Gary's, sent termination letters to Blue Cross/Blue Shield and U.S. Healthcare.[1] In response to the letter, Chen testified that she received an angry and verbally abusive phone call from an unidentified U.S. Healthcare marketing executive.[2] So began the wrath of U.S. Healthcare. Upon receipt of Gary's letter terminating its insurance contract, David Rocchino, one of U.S. Healthcare's sales vice-presidents, telephoned Wolfson to inform him of the new development and expressed his displeasure. Wolfson became "upset" that Gary's had decided to self-insure, and knowing that Gary's was approved to serve as a pharmacy for U.S. Healthcare subscribers, promptly ordered an internal "quality assurance" review of the generic utilization rates of Gary's stores. Wolfson admitted at trial that his only reason for ordering such a review was that Gary's had terminated U.S. Healthcare coverage for its employees, but he testified that ordering a retaliatory review was not inappropriate.[3]

_____

1. The letter to U.S. Healthcare read:

> Dear Sirs:
>
> This letter is to advise U.S. Healthcare that effective June 30th, 1991, . . . Gary's will discontinue its medical insurance coverage with your organization. Please adjust your records to reflect this upcoming change and advise me of any information you may need to finalize our relationship.

2. In contrast, Chen testified to the receipt of a polite and professional phone call from a Blue Cross/Blue Shield representative, inquiring if they could accommodate Gary's needs in anyway and as to the reason behind Gary's decision to cancel their health care contract.

3. When asked by BCI's counsel whether he ordered the review of Gary's in response to Gary's decision to terminate with U.S. Healthcare, Wolfson responded:

13

In August 1993, Gary's opened its fifth store, in Abington, Pennsylvania. Gary's applied for admission of the new store to U.S. Healthcare's pharmacy network. Wolfson, acting as director of U.S. Healthcare's pharmacy program, advised Brownstein not to process the application. U.S. Healthcare's executives acknowledged in their testimony that their motivation in refusing to process Gary's application was retaliatory, based on a belief that Gary's did not deserve U.S. Healthcare's business once Gary's had terminated U.S. Healthcare's contract in a manner that Wolfson and Brownstein found to be offensive. In compliance with Wolfson's instructions, Brownstein did not process the application. However, at this time, no one at U.S. Healthcare told Gary's of the decision to refuse to process the application. Instead, Gary's was informed that the application would be processed in due course. As Wolfson conceded at trial, the plan was to "let [Gary's] hang . . . until they did something."

At the same time that Gary's Abington store applied for membership in the pharmacy network, U.S. Healthcare, at the instruction of Brownstein, performed a two-day, on-site audit of the utilization of generic drugs at Gary's store in Eagleville, Pennsylvania. The audit measured the pharmacy's compliance with the requirement of U.S. Healthcare's provider agreement that generic drugs be used whenever possible to contain costs. The audit results suggested that Gary's dispensed brand-name drugs instead of generic drugs at a rate higher than the median of the U.S. Healthcare provider, and lacked complete documentation of prescription requests. Brownstein's audit also demonstrated that the average cost-per-prescription to U.S. Healthcare at the Eagleville pharmacy was in line with the network median, so that the store's prescriptions were not costing U.S. Healthcare more on average than other

_____

Well, I didn't think it was appropriate with an account that we had
a relationship with just to send a "dear sir" letter [of termination] to
a post office box . . . . I didn't feel that they were giving us due
consideration and if they were operating in that fashion, I wanted to
look to see if in fact there were any other issues related to the I Got
It At Gary's Pharmacies.

14

pharmacies. Brownstein forwarded the audit results to the Quality Assurance Committee, which referred the matter to the Peer Review Committee. The Peer Review Committee, consisting of three outside pharmacists, had the power to recommend sanctions to Wolfson, who would then decide whether or not to impose them.

On November 16, 1993, the Peer Review Committee recommended that Gary's Eagleville store be put on"freeze" for three-months. The freeze was implemented and, as a result, U.S. Healthcare removed the Eagleville store from the list of approved pharmacies, and new U.S. Healthcare subscribers could not designate that store as their location for purchasing prescription drugs. In contrast to the treatment of Gary's, other pharmacies with generic drug utilization rates lower than the Eagleville pharmacy and less complete documentation of prescription requests, had not been "frozen," and instead had received lesser or no sanctions. In fact, the parties stipulated that out of the approximately 1300 pharmacies in the U.S. Healthcare network for southeastern Pennsylvania and southern New Jersey, the freeze sanction had been imposed for generic utilization reasons only four times (including its use against Gary's) in all of 1993 and 1994.

Although the extent to which Wolfson and Brownstein were involved in the implementation of the freeze sanction is unclear, both had participated regularly in Quality Assurance and Peer Review Committee meetings. Brownstein later cited the results of the audit on the Eagleville store as the reason for the delay in processing the Abington store's application for membership in the pharmacy network, stating that U.S. Healthcare had concerns about Gary's dispensing too many brand-name drugs at its stores.

Faced with a freeze on its Eagleville store and no movement on the Abington store's application for membership in the pharmacy network, Gary's President, Gary Wolf, set up a meeting with U.S. Healthcare officials, including Wolfson and marketing executive Scott Murphy, for December 1, 1993. Among the issues discussed were Gary's generic drug use and the admission of the Abington store to the U.S. Healthcare provider network.

15

U.S. Healthcare expressed its displeasure with Gary's termination of U.S. Healthcare coverage in 1991, and Wolfson commented that "we like to do business with people who do business with us." At the same meeting, U.S. Healthcare requested and received permission to bid on Gary's TPA business for the next annual contract period.

C. Gary's Switch to CHA/U.S. Healthcare

Following the meeting with U.S. Healthcare, Wolf instructed his sister, Robin Risler, the Director of Human Resources at Gary's, to "take a look at" switching to the TPA services offered by CHA at the anniversary date of Gary's contract with BCI (at which time the contract could be terminated with 30 days advance notice.) Concurrently, Wolf sent a letter to Wolfson (dated December 6, 1993) expressing, among other things, his "commitment that we will do everything possible to afford [U.S. Healthcare/CHA] the opportunity to service our company's needs as long as the programs are mutually beneficial", and requesting that U.S. Healthcare consider acting on the pending application for Gary's Abington store.

When the December 6 letter failed to produce any movement on the Abington store, Wolf explained to Chen that, in order to get the Abington store approved, Gary's needed to "appease" U.S. Healthcare, and instructed her to write a further letter to U.S. Healthcare assuring them that Gary's would consider CHA's bid for its TPA services. This letter, dated January 3, 1994, and addressed to Murphy, was more explicit then the December 6 letter. It stated:

> As you requested, I am writing you to acknowledge the agreement made between I got it at Gary's and U.S. Healthcare. We agree that as long as there are no additional cost[s] to the plan or reduction in service, US Healthcare will assume the role of TPA for our self insured medical plan on July 1, 1994.

* * *

> We also understand that in anticipation of our strengthening relationship, US Healthcare will release the provider number for our pharmacy in Abington, PA.

16

Chen testified that once this letter was written, it was a "foregone conclusion" that, as long as CHA's bid was comparable and for the same services, Gary's would switch to CHA. As of this time, CHA had not yet submitted a formal proposal to Gary's.

In January 1994, within weeks of Chen's letter, U.S. Healthcare had inspected the Abington pharmacy, and, without further ado, approved its participation in the provider network. Brownstein testified that he was informed that Gary's had agreed to switch TPAs to CHA, and "on the basis of that," was instructed to enroll Gary's Abington store in the provider network. U.S. Healthcare acted with such speed in approving the Abington store's application for membership in the provider network that it failed to follow its own standard approval procedures, and did not present the store's application to the Membership Application Credentials Committee until after the pharmacy was already participating as a provider.

In February 1994, U.S. Healthcare lifted the freeze on the Eagleville store. Similarly, Gary's sixth pharmacy in Aston, Pennsylvania, was accepted into the provider network without delay. At approximately this same time, Robin Risler, who testified that, ultimately, the selection of a TPA was her responsibility, hired an insurance broker to assist her in evaluating the competing TPAs. In early June 1994, both BCI and CHA submitted bids for Gary's TPA business, but CHA was given the opportunity to review BCI's bid before submitting its final proposal. In May 1994, even before Gary's had received a proposal from U.S. Healthcare, Risler told Lori Manley, the BCI customer service representative, that Gary's would be switching to CHA/U.S. Healthcare. Manley testified that Risler confided that she felt she was being "strongarmed" by U.S. Healthcare, that "she herself did not want to leave BCI" and that the decision "was out of her control." Two other BCI employees similarly testified that in the spring of 1994, Risler denied having any real choice in the decision to give Gary's TPA business to CHA in light of the loss of U.S. Healthcare's business that Gary's would suffer if it failed to switch TPAs. The testimony with respect to Risler of Manley and the two additional BCI employees was

17

admitted over U.S. Healthcare's objection as state of mind evidence. See infra note 31.

As the time for Gary's formal switch to CHA drew near, U.S. Healthcare scheduled another on-site "quality assurance" audit, this time of Gary's Lansdale store for June 16, 1994. In the second week of June, Risler officially informed BCI of Gary's decision to give its TPA business to CHA. After Gary's decision was officially announced, the audit of the Lansdale store uncovered no problems. Moreover, there were no further audits of Gary's pharmacies.

The reasons behind Risler's decision to switch to CHA are in dispute. BCI's TPA expert, Carlton Harker, testified that for the one year period of 1994-95, the BCI proposal would have saved Gary's approximately $64,000, or 14%, compared to the proposal submitted by CHA. Harker further testified that he did not perceive any significant differences in the services provided under the respective plans that would explain the cost differential. Risler testified that, in making the decision to give Gary's TPA business to CHA, she was motivated by non-price, quality of service reasons. She also acknowledged, however, that she had been satisfied with BCI's services. At all events, the results of the decision are clear -- BCI lost its contract with Gary's.

In March 1995, BCI filed the present suit challenging the defendants' actions that preceded Gary's decision to terminate its TPA contract with BCI. BCI proceeded at trial against defendants on four counts. Count I alleged that U.S. Healthcare, HMO PA, and CHA violated Section 1 of the Sherman Act, 15 U.S.C. S 1, by tying the participation by Gary's in the U.S. Healthcare pharmacy network to the purchase of CHA's TPA services for Gary's employees. In Count II, BCI alleged that all defendants violated the Racketeer-Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. S 1961 et seq., by engaging in or conspiring to commit at least two acts of racketeering activities, among them extortion, bribery, mail and wire fraud, and violations of the Travel Act.

In a Count III, BCI also contended that, to the extent that defendants Wolfson, Murphy, and Brownstein were not

principal wrongdoers, they are liable for aiding and abetting under RICO. Finally, in Count IV, BCI alleged that all defendants tortiously interfered with its existing or prospective contractual relationship with Gary's in violation of state law. BCI sought treble damages and attorneys fees under its federal law claims. It also sought punitive damages from each defendant in connection with its state law claim.

D. Economic Evidence

1. Impact on Gary's

BCI argued at trial that Gary's ability to operate profitably depended on the business of U.S. Healthcare subscribers. As evidence, BCI pointed to the parties' stipulation that, as of December 1993, when Wolfson told Gary Wolf that U.S. Healthcare likes to do business with people "who do business with us," 9,178 U.S. Healthcare subscribers had designated Gary's as their provider pharmacy, and that in 1993, Gary's subscribers purchased $1.66 million of prescription drugs. BCI's expert Dr. Calvin Knowlton, who is an associate professor and Chair of the Department of Pharmacy Practice and Pharmacy Administration at the Philadelphia College of Pharmacy and Science, and the President of the American Pharmaceutical Association, testified that, based on the stipulated information and Gary's Sales Reports, in 1993, U.S. Healthcare members accounted for between 3-15% of Gary's prescription drug sales, and, by 1995, for 20% of prescription drug sales in Gary's Montgomery County stores.

If Gary's operated as an unapproved pharmacy, any U.S. Healthcare subscriber who wanted to fill his or her prescription at Gary's would have to pay full price, instead of a small co-payment. Additionally, Gary's head pharmacist testified that prescription drug purchasers are valuable consumers because they typically purchase other items in addition to their prescription drugs. BCI also presented evidence that the prescription drug business of pharmacies is a low-margin business that depends on high volume in order to operate profitably. In order to maximize

19

their sales, pharmacies typically become members of as many prescription drug plans as possible. Out of approximately 1300 participating pharmacies in southeastern Pennsylvania and southern New Jersey, only four pharmacies left the U.S. Healthcare pharmacy network in the period from January 1, 1993 to October 1, 1995 for reasons other than going out of business.

## 2. Knowlton's Survey

At trial, BCI presented a telephone survey of the market areas surrounding several of Gary's pharmacies, performed by Dr. Knowlton, which was admitted over objection. In this survey, pharmacy students telephoned six to eight pharmacies in the vicinity of three arbitrarily selected Gary's store locations and asked them a series of questions. Knowlton drew conclusions regarding U.S. Healthcare's market power based only on the responses of those stores that listed U.S. Healthcare as their primary HMO customer. He testified that based on this survey U.S. Healthcare's market share of prescription drug sales for the market areas served by the two largest Gary's pharmacies and the new Abington pharmacy was approximately 25%. Knowlton further testified that other sources of information indicated that his survey conclusions as to market share would apply generally in Montgomery County.

## 3. Interaction Between U.S. Healthcare and Other Pharmacy Operations

The jury also heard evidence of the interaction between U.S. Healthcare and Rite-Aid, Shop-Rite, Food Circus, Walmart, Phar-mor and Weis Markets. With respect to the pharmacy operation in each of these chains, U.S. Healthcare conditioned participation in the provider network upon their making U.S. Healthcare insurance available to their employees. Despite initial resistance, Rite-Aid, Phar-Mor and Weis Markets ultimately agreed to offer their employees U.S. Healthcare insurance products. There was, however, an absence of supporting evidence on the point, and it is not clear that these large companies made U.S. Healthcare a part of their benefits package in response to economic pressure rather than for legitimate business reasons.

20

Shop-Rite and Food Circus responded by filing complaints with the New Jersey Department of Insurance.4 After the Department of Insurance took action, U.S. Healthcare agreed to accept the stores into its provider network notwithstanding their refusal to offer U.S. Healthcare coverage. The Walmart stores also resisted U.S. Healthcare's policy, choosing instead to forgo membership in the provider network. U.S. Healthcare did approve the Walmart stores in Massachusetts, where an Any Willing Provider statute was in force. Defendants' experts testified that linkage of network membership and purchase of TPA services was normal business behavior and was not anti-competitive.

4. The Setting of Reimbursement Prices

BCI also presented evidence of how U.S. Healthcare exercised its market power to set reimbursement prices. In January 1996, it effected a drastic reduction in the reimbursements it paid to participating pharmacies for prescription drugs dispensed to U.S. Healthcare subscribers. Dr. Knowlton testified that this reduction, when considered with the fact that U.S. Healthcare does not pay pharmacies a dispensing fee, made U.S. Healthcare's overall compensation to pharmacies the lowest of any third-party payor in the southeastern Pennsylvania region. Yet, notwithstanding the major reimbursement price reduction, only two pharmacies out of approximately 8000 in 12 or 13 states discontinued their participation in the U.S. Healthcare provider network.

Dr. Knowlton testified that, based on this evidence, and the evidence of U.S. Healthcare's successful dominance of other pharmacies, exclusion from the U.S. Healthcare provider network could threaten Gary's survival. As a result, he testified that Gary's had no choice but to accept U.S. Healthcare's arrangement.

_____

4. The record does not develop the extent to which these complaints may have been facilitated by New Jersey's enactment, in July 1994, of an Any Willing Provider statute which provides that a pharmacy cannot be excluded from an HMO if it "accepts the terms" of the HMO. N.J. Stat. Ann. S 26:2J-4.7(a)(2) (West 1996).

E. The Jury Verdict

After 17 days of trial, the case was submitted to the jury on special interrogatories. The jury returned a verdict for BCI on all counts and awarded BCI $200,000 in compensatory damages.[5] The jury also awarded BCI $1,000,000 in punitive damages in connection with its tortious interference claim. That award was apportioned as follows: $400,000 against U.S. Healthcare, $200,000 against CHA, $100,000 against HMO PA, $200,000 against Wolfson, $75,000 against Murphy, and $25,000 against Brownstein.

At the close of BCI's case, and again at the close of all evidence, the defendants moved, pursuant to Fed. R. Civ. P. 50(a), for judgment as a matter of law. These motions were denied. Following the verdict, defendants renewed their motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b). Concurrently, defendants filed an alternative motion for a new trial pursuant to Fed. R. Civ. P. 59. The district court denied these motions in all respects. On appeal, defendants challenge the denial of these motions. The majority of the issues before us arise from the district court's denial of defendants' renewed motion for judgment as a matter of law, and, as to these issues, our review is plenary. See Stelwagon Mfg. Co. v. Tarmac Roofing, 63 F.3d 1267, 1270–71 (3d Cir. 1995) ("The legal foundation for the jury's verdict is reviewed de novo while the factual findings are reviewed to determine whether the evidence and justifiable inferences most favorable to the prevailing party afford any rational basis for the verdict."). Where a different standard of review is implicated, it will be noted in the text.

_____

5. The district court's initial order of judgment made it unclear whether BCI was to receive $200,000 in total compensatory damages, or to recover that amount separately on each of its three legal theories (thus allowing a total recovery of $600,000 in compensatory damages). In response to defendants' motion, pursuant to Fed. R. Civ. P. Rule 59(e), to alter or amend the order of judgment, the district court subsequently amended its order to make clear that BCI may recover only once the $200,000 in compensatory damages that it was awarded. BCI does not dispute this point on appeal.

III. THE ANTITRUST ISSUES

A. Introduction -- Characterization of BCI's Claim

BCI's antitrust claim arises from U.S. Healthcare's decision to use the leverage acquired by virtue of its ability to provide Gary's access to thousands of potential pharmacy customers to pressure Gary's into selection of its subsidiary, CHA, as its TPA. BCI claims that this arrangement was an illegal tie in violation S 1 of the Sherman Act, 15 U.S.C. S 1, which generally outlaws "[e]very contract . . . in restraint of [interstate or international] trade or commerce." Defendants submit that their conduct was simply hard bargaining that is well within the mainstream of business conduct and does not form the basis of a cognizable antitrust claim.

At trial, BCI's theory of the case prevailed. The jury found that U.S. Healthcare's practices were illegal under both per se and rule of reason theories of antitrust liability. On appeal, defendants challenge the characterization of the arrangement at issue as a tying arrangement. They contend that the arrangement was one of reciprocal dealing and not tying, and that as a result the per se test for antitrust liability is inapplicable. Before turning to a review of the jury verdict, which the defendants challenge, we will consider the characterization question.

Tying exists where a seller conditions the sale of one good (the tying product) on the buyer also purchasing another, separate good (the tied product). See Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 475 (3d Cir. 1992) (in banc). The antitrust concern over tying arrangements arises when the seller can exploit its market power in the tying market to force buyers to purchase the tied product which they otherwise would not, thereby restraining competition in the tied product market.6 See

_____

6. Of course, not all tying arrangements have anti-competitive effects in violation of the Sherman Act. The Supreme Court has twice made use of the following as an example of a tie that is not a concern of the antitrust laws: "[I]f one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to

Allen–Myland, Inc. v. International Bus. Mach. Corp., 33 F.3d 194, 200 (3d Cir. 1994); Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12 (1984).

Unlike tying –– where one party is only a seller and the other only a buyer –– reciprocal dealing exists where "two parties face each other as both buyer and seller. One party offers to buy the other party's goods, but only if the second party buys other goods from the first party." Spartan Grain & Mill Co. v. Ayers, 581 F.2d 419, 424 (5th Cir. 1978). More colloquially, reciprocal dealing exists when one party tells the other: "I'll buy from you, if you buy from me." Again, like tying, not all reciprocal dealing arrangements are anti-competitive. The Sherman Act is concerned with what has been termed "coercive" reciprocal dealing, where a party uses its economic power as a purchaser in one market in order to restrict competition in another market where it is a seller. See Betaseed, Inc. v. U & I, Inc., 681 F.2d 1203, 1216 (9th Cir. 1982).7

BCI argued, and the jury found, that U.S. Healthcare and CHA tied the purchase of CHA's TPA services to the right to continued participation in the U.S. Healthcare pharmacy network. In order to characterize this arrangement as a tie, U.S. Healthcare must be deemed to have "sold" Gary's the ability to participate in its pharmacy network, but only if Gary's also purchased CHA's TPA services. Defendants contend that BCI's characterization is not correct since U.S. Healthcare did not "sell" Gary's the ability to participate in the pharmacy network as participation in that network is free. In fact, the ultimate result of the

_____

restrain competition if its competitors were ready and able to sell flour by itself." Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12 (1984) (quoting Northern Pac. R. Co. v. United States, 356 U.S. 1 (1958)). Indeed package sales such as those noted in the foregoing example may be used by a seller as a means of competing, and may be desired by buyers. The Sherman Act is not designed to preclude such arrangements. See id.

7. This is distinguished from "mutual" reciprocal dealing which occurs "when both parties stand on equal footing with respect to purchasing power, yet they agree to purchase from one another." Betaseed, 681 F.2d at 1216.

contract was that money flowed in the opposite direction -- from U.S. Healthcare to Gary's in exchange for prescription drugs purchased by U.S. Healthcare members that designated one of Gary's stores as their network pharmacy. Thus, defendants argue, the arrangement is more accurately labeled as reciprocal dealing where U.S. Healthcare conditioned its agreement to purchase prescription drugs from Gary's on Gary's agreement to purchase TPA services from CHA.

We agree that the arrangement is not tying. While there is force to defendants' broader argument, we do not believe that the relationship between Gary's and U.S. Healthcare can be neatly squeezed into the purchase/sale paradigm. As a result, we are hesitant to conclude that the arrangement was reciprocal dealing, but instead believe that the true character of the arrangement lies somewhere between the two practices. Fortunately, resolution of the antitrust issue presented in this appeal does not require us to wedge the facts into either doctrinal box, for we conclude that there was insufficient evidence to support liability under the Sherman Act regardless of the label placed on the challenged arrangement.

The law is well developed as to when tying arrangements should give rise to liability under the Sherman Act. Such arrangements can be deemed illegal per se or be found to violate the rule of reason. Per se liability exists where the defendant is found to have appreciable market power in the tying market. In such cases, the ability to leverage this power to restrain trade in the tied market is presumed and no inquiry need be made into the actual prevailing market conditions in that market. See Jefferson Parish, 466 U.S. at 15-18 & n. 25; Town Sound, 959 F.2d at 477. Where appreciable tying market power cannot be shown, inquiry into the tied product market cannot be avoided, and the plaintiff therefore has the more difficult burden of showing that the arrangement violated the rule of reason because it unreasonably restrained competition in the tied product market. See Jefferson Parish, 466 U.S. at 29.

In contrast to tying arrangements, reciprocal dealing has not been the subject of extensive case law development. Indeed, this Court has yet to set forth a test for determining

25

when a reciprocal dealing arrangement runs afoul of the Sherman Act.8 Defendants seek to persuade us to fill this vacuum by holding that reciprocal dealing arrangements cannot be found illegal per se, but instead should be judged only under the less rigorous rule of reason test.9 This position has not been adopted by any of our sister circuits. All those that have examined the relationship between tying and reciprocal dealing have determined that each practice

_____

8. Defendants suggest that we set forth a rule for judging reciprocal dealing arrangements in W.L. Gore & Assocs., Inc. v. Carlisle Corp., 529 F.2d 614, 624 (3d Cir. 1976) where we stated that:

> [T]he use of substantial purchasing power in one product market to
> coerce a supplier into a reciprocating purchase in another market
> may be an illegal restraint of trade if the user's purchasing power is
> sufficiently substantial and its use results in substantial foreclosure
> of competition in the other weaker product market.

In Gore, the owner of two patents brought an action for infringement. The defendant's answer denied the validity of the patents, asserted that one of the patents was unenforceable because of fraud in its procurement, and counterclaimed for damages alleging a violation of the Sherman Act. After trial, the district court entered a judgment holding one of the patents valid and infringed and the other patent invalid, granting the plaintiff an injunction restraining the defendant from infringing the valid patent, and determining that plaintiff had violated the Sherman Act. Both parties appealed from the judgment. In determining that we had jurisdiction to review the injunction, we expressly stated that we had no jurisdiction in an interlocutory appeal over the antitrust counterclaim of the defendant. See id. at 618. Thus, the statement in Gore regarding reciprocal dealing was dicta, and does not establish a rule.

9. In support of this view, defendants primarily rely on Phillip E. Areeda et al., Antitrust Law, a leading treatise. Areeda argues that "forced reciprocal exchanges are . . . legally distinct from ties and need not receive the same antitrust treatment." X Areeda, Antitrust Law P 1750c, at 268 (1996). He believes that reciprocal trading should not be illegal per se, and that such a claim should instead be judged solely under the rule of reason test. See Id. P 1778, at 460-61. Professor Areeda's view may be colored by his belief that tying arrangements also should not be illegal per se, a view that is contrary to current law. See IX Areeda, Antitrust Law P 1730, at 406 14 (1991).

26

should be evaluated under both the per se and rule of reason tests.[10]

This position is logical since both practices implicate the same antitrust concern -- the unlawful extension of economic power in one market to another market. However, we decline to resolve this conflict here since the amorphous and idiosyncratic nature of this case does not provide an appropriate framework in which to fully flesh out the need for a separate test for reciprocal dealing arrangements. Further, we need not reach this issue in order to resolve the present appeal since we find that BCI failed to set forth either a valid per se or rule of reason antitrust claim -- a finding fatal to both a tying claim and a reciprocal dealing claim under any test we might devise.

B. Per se Liability

Since our jurisprudence regarding both per se and rule of reason liability has developed in the context of tying cases, we will use the terms "tying" product market and "tied" product market to describe the two markets at issue despite our belief that the arrangement in this case lies somewhere between tying and reciprocal dealing. The per se test is used in cases where exploitation of leverage in the market for the tying product is "probable". See Jefferson Parish, 466 U.S. at 15; Town Sound, 959 F.2d. at 476-77. The elements of a per se claim are (1) the  defendant seller

_____

10. See, e.g., Betaseed, Inc. v. U&I, Inc., 681 F.2d 1203, 1221 (9th Cir. 1982) ("The similarity between coercive reciprocity and tying arrangements, both in form and in anti-competitive consequences, leads to the conclusion that the two practices should be judged by similar standards."); Spartan Grain & Mill Co. v. Ayers, 581 F.2d 419, 425 (5th Cir. 1978) (holding that label of tying and reciprocal dealing was immaterial, and that the per se standard should be applied in both); E.T. Barwick Indus. v. Walter E. Heller & Co., 692 F. Supp. 1331 (N.D. Ga. 1987) (same legal standards apply to reciprocal dealing as tying), aff'd 891 F.2d 906 (11th Cir. 1989). See also II Earl W. Kintner, Federal Antitrust Law S 10.67, at 264-65 (1980) ("[T]he very presence of the element of coercion indicates that such reciprocal dealings are only anti-competitive in effect. It is widely agreed that coercive reciprocality, like
tying arrangements, should be considered a per se violation of Section 1 of the Sherman Act.").

must sell two distinct products; (2) the seller mu st possess market power in the tying product market; and (3)  a substantial amount of interstate commerce must be affected. See id. at 477. Where such elements are shown, the defendant's tying practices are condemned without further proof of anti-competitive effect. See id. Principally at issue in this appeal is whether BCI met its burden of proving the second element of this test: that U.S. Healthcare exercised market power in the tying market.[11]

The jury determined that U.S. Healthcare exercised sufficient market power in the tying market to constitute a per se violation of the Sherman Act. The viability of that finding, however, depends on the correctness of the market definition sent to the jury. Defendants maintain that the definition was incorrect as a matter of law, and that U.S. Healthcare could not exercise sufficient power in a properly defined tying market to sustain a per se claim.

## 1. Defining the Relevant Market

Before we can evaluate the extent to which U.S. Healthcare exercises power in the tying market, that market must be properly defined. A market has two components, product and geographic. See Brown Shoe Co. v. United States, 370 U.S. 294, 325-28 (1962). The burden is on the plaintiff to define both components of the relevant market. See Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997); Pastore v. Bell Telephone Co., 24 F.3d 508, 512 (3d Cir. 1994); Tunis Bros Co., Inc. v. Ford Motor Co., 952 F.2d 715, 726 (3d Cir. 1991). The tying market definition asserted by BCI and adopted by the jury was: "U.S. Healthcare members with prescription drug benefits in the areas surrounding . . . Gary's pharmacies in suburban Philadelphia." Defendants contend that this definition contains both a flawed product market -- U.S. Healthcare members with prescription drug benefits-- and a flawed geographic market -- the areas surrounding Gary's pharmacies in suburban Philadelphia. They submit

_____

11. The other issues have not been briefed by the parties. The third element is plainly not disputed. While arguably there is an implicit challenge to the first element, it would involve the characterization question, and we need not reach it.

28

instead that the relevant tying market consists of "all purchasers of prescription drugs in the greater Philadelphia area."

We agree that BCI failed to meet its burden of presenting sufficient evidence to support the product and geographic markets adopted by the jury. However, while the evidence enables us to determine that the proper product market consists of all purchasers of prescription drugs, it is more difficult to determine the relevant geographic market on the basis of the record. Fortunately, as will be shown, delineation of the exact contours of the geographic market is not necessary to an evaluation of the merit of plaintiff's per se claim. We turn first to the product market issue.

### a. The Product Market

BCI has posited a single brand market consisting solely of U.S. Healthcare members with prescription drug benefits. Should we accept this market definition our inquiry would be at an end, for U.S. Healthcare must, by definition, control 100% of this product market regardless of the geographic market. BCI seeks to support this product market by arguing that no products are "reasonably interchangeable" with U.S. Healthcare members, and that it is compelled by the Supreme Court's decision in Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451 (1992). Examining each of these contentions in turn, we conclude that this narrow market definition cannot stand as a matter of law.

The outer boundaries of a product market are determined by evaluating which products would be reasonably interchangeable by consumers for the same purpose. See Allen-Myland, 33 F.3d at 201 n.8; Town Sound, 959 F.2d at 480. "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there might be some degree of preference for the one over the other, either would work effectively." Allen Myland, 33 F.3d at 206. One measure of interchangeability is "cross elasticity of demand between the product itself and substitutes for it." Queen City Pizza, 124 F.3d at 437 (quoting Brown Shoe Co. v. U.S., 370 U.S. 294, 325 (1962)).

29

When there is cross-elasticity of demand between products in a market, "the rise in the price of a good within [the] relevant market would tend to create a greater demand for other like goods in that market." Tunis Brothers, 952 F.2d at 722.

Thus the issue is which products, if any, Gary's, the consumer, would find to be reasonably interchangeable with, or substitutable for, U.S. Healthcare members who purchase prescription drugs. Defendants argue that no evidence in the record contradicts the logical assumption that Gary's considers members of other prescription plans, or uninsured persons, completely interchangeable with U.S. Healthcare members. We agree.

The only evidence to which BCI directs us to support its argument that there are no products reasonably interchangeable with U.S. Healthcare customers is that when U.S. Healthcare lowered the prices it would pay to pharmacies for the purchase of prescription drugs by U.S. Healthcare members, none of the pharmacies dropped out of the U.S. Healthcare network. BCI asserts that this shows that there is no cross-elasticity of demand between U.S. Healthcare members and other purchasers of prescription drugs since, if there were, then the lowering of prices would have caused pharmacies to stop doing business with U.S. Healthcare customers in favor of other customers who paid more.

This evidence does not support BCI's market definition. The fact that participating pharmacies do not drop out of the U.S. Healthcare network when it lowers its payment schedule does not prove that U.S. Healthcare's action failed to increase the pharmacies demand for customers who are not members of U.S. Healthcare. Even though pharmacies undoubtedly desire higher profit customers, it would not be necessary for them to drop out of the U.S. Healthcare network in order to pursue, or acquire, these customers. Nor would it be economically rational to do so since pharmacies, like most businesses, seek as many customers as they can find.12

---

12. We assume that membership in the U.S. Healthcare network remained profitable after U.S. Healthcare lowered its payment schedule.

Moreover, to the extent that BCI is arguing that U.S. Healthcare customers are not interchangeable with other customers because the market for prescription customers is so competitive that U.S. Healthcare members are difficult to replace, this argument also does not support its product market definition. Product market definition turns on the existence of close substitutes for a particular product, not on the ability of any particular consumer to switch effortlessly to such substitutes. It is true that when Gary's loses a supply of customers it must compete for other customers to make up lost sales; however, this does not mean that those new customers, when found, would not be interchangeable with U.S. Healthcare members from Gary's standpoint.

BCI also seeks to support its single brand market by reference to the Supreme Court's opinion in Kodak. That case, however, is inapposite. In Kodak, independent service organizations brought suit alleging that Kodak had tied replacement parts for its copiers to Kodak repair service. See 504 U.S. at 459. Although Kodak exercised complete control over the market for the tying product -- replacement parts for its copiers -- since they were unique, see id. at 456-57, it argued that it could not, as a matter of law, have sufficient market power in that derivative aftermarket to restrain trade because the primary market for new copiers was competitive. According to Kodak, any attempt to exercise market power in the derivative market for copier parts would raise the "life cycle" cost of owning a Kodak copier, and customers would buy fewer Kodak copiers, making the attempt unprofitable. See id. at 470.

The Supreme Court declined to let Kodak's economic theory prevail on summary judgment, holding that, under certain circumstances, the buyer of a Kodak copier could be "locked in" to the Kodak parts market by virtue of the

_____

To the extent that BCI is arguing that pharmacies stayed in the U.S. Healthcare network despite the fact that it became unprofitable to do so, this argument renders their overall claim a non sequitur. U.S. Healthcare cannot exercise control over pharmacies via access to its network where membership in that network causes pharmacies to lose money.

31

high "switching costs" of purchasing a new copier from another manufacturer. See id. at 476. In such a situation, Kodak copier owners would be forced to purchase copier parts from Kodak since there were no reasonable substitutes for such parts. Thus, Kodak establishes that a single brand market may be considered the relevant market where a legitimate class of consumers is locked in to purchasing a non-interchangeable tying product in a derivative market due to high switching costs in the primary market. See Queen City Pizza, 124 F.3d at 439-40.

BCI directs us to no evidence introduced at trial to support a conclusion that Kodak is applicable to this case. On appeal, they argue that U.S. Healthcare members are "locked in" to U.S. Healthcare and, by extension, to the pharmacies in its provider network. We doubt that this argument is factually correct, for we find no evidence suggesting that U.S. Healthcare members who wish to switch HMOs face switching costs significant enough to constitute a lock in. But even if it is, the argument is misplaced since Kodak is concerned with the situation where the victims of the alleged tie -- in that case, the purchasers of Kodak copiers -- are faced with high switching costs and thus are "locked in" to the market for the tying product. Under BCI's theory of the case, Gary's is the purchaser of the tying product which is U.S. Healthcare members who purchase prescription drugs. Thus in order to fall within Kodak's concept of lock in, BCI needed to, at a minimum, provide evidence that Gary's -- not U.S. Healthcare members -- was locked into the U.S. Healthcare network. That it did not do.

### b. The Geographic Market

BCI proposed a non-contiguous, gerrymandered geographic market consisting solely of the areas surrounding Gary's pharmacies in suburban Philadelphia. To meet its burden of proving the relevant geographic market, see Tunis Brothers Co., 952 F.2d at 726, BCI was required to show that the geographic market it proposed was "the area in which a potential buyer may rationally look for the goods or services he or she seeks." See id.

32

(quoting Pennsylvania Dental Ass'n v. Medical Serv. Ass'n of Pa., 745 F.2d 248, 260 (3d Cir. 1984)).

The only evidence that BCI offered to support its geographic market was testimony from Dr. Knowlton that the area from which Gary's stores, or any pharmacies, draw their customers is made up of primary and secondary trading areas surroundings its stores. Knowlton defines a primary trading area is the geographic area surrounding a pharmacy from which it draws 50% of its clientele, and a secondary trading area as the geographic area from which it draws 90% of its clientele.

We believe that Knowlton is undoubtedly correct to the extent that the jury could reasonably find that pharmacy customers generally use pharmacies near their home. Thus we reject defendants' argument that the relevant geographic market should be the greater Philadelphia area.13 However, mere invocation of the common-sense precept that customers use pharmacies near their homes does not satisfy BCI's burden of showing that the particular geographic market chosen fairly represents "the area in which a potential buyer may rationally look for the goods or services he or she seeks." In this case, where BCI introduced no evidence to support such a conclusion, an amorphous and gerrymandered geographic market cannot stand as a matter of law. See id. at 727 ("The mere delineation of a geographical area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographic market.").

2. U.S. Healthcare's Power in the Tying Market

Having determined that the market definition adopted by the jury was erroneous as a matter of law, we are now faced with the task of assessing U.S. Healthcare's market

_____

13. Defendants rely primarily on evidence that Gary's advertised in the greater Philadelphia area to support their expansive conception of the geographic market. This reliance is misplaced since "the geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product." Tunis Bros., 952 F.2d at 726.

power in a properly defined market on the basis of the trial record. Our task is made more difficult by the fact that the record does not contain sufficient evidence to enable us to clearly define the relevant geographic market. In most instances, the proper course in the face of such circumstances would be to remand the case for a new trial; however, our review of the record indicates that it is simply not possible for U.S. Healthcare to have exercised sufficient market power in the properly defined product market to constitute a per se violation in any plausible geographic market.

In order to impose per se antitrust liability, it must be shown that the defendant had "appreciable economic power in the tying market." Kodak, 504 U.S. at 464 (emphasis added). "Market power is defined as the ability`to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market.' " Allen–Myland, 33 F.3d at 200 (quoting United States Steel Corp. v. Fortner Enters., Inc. (Fortner II), 429 U.S. 610, 620 (1977)). Since "[t]he existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market," Kodak, 504 U.S. at 464 (citations omitted), we turn first to an inquiry into U.S. Healthcare's share of the market for drug prescription customers. In so doing, we are mindful of the fact that "[m]arket share, of course, is only one type of evidence that may prove the defendant has sufficient market power to impose per se antitrust liability." Allen–Myland, 33 F.3d at 209.

### a. Evidence of Market Share

At trial, BCI's sole evidence of market share derived from a survey conducted by Dr. Knowlton. His survey concluded that U.S. Healthcare members purchased twenty to twenty-five percent of the prescriptions at the surveyed pharmacies. Defendants argue that this market share is insufficient as a matter of law to serve as the basis for a finding of a per se violation. We agree.14 The highest

(Text continued on page 36)

_____

14. Defendants also argue that the district court abused its discretion in admitting the survey. We also agree with this contention; however, since

34

we conclude that even if the survey were admitted, it would not help BCI, we address the methodological errors that should have barred its admission only briefly.

Survey results offered as proof of the matter asserted are hearsay, and thus the results of a survey, and any testimony based on those results, cannot be admitted into evidence unless the survey falls into a recognized class exception to the hearsay rule or into the residual exception contained in Fed. R. Evid. 803(24). See Pittsburgh Press Club v. United States, 579 F.2d 751, 755-58 (3d Cir. 1978). In this case none of the class exceptions are present, so we examine whether the survey contains the "circumstantial guarantees of trustworthiness" required for admissibility under Rule 803(24).

In Pittsburgh Press, we stated that "the circumstantial guarantees of trustworthiness are for the most part satisfied if the poll is conducted in
accordance with generally accepted survey principles." Id. at 758. We then discussed several factors which must be examined in determining whether a poll meets generally accepted survey principles

>       A proper universe must be examined and a representative sample
>       must be chosen; the persons conducting the survey must be
>       experts; the data must be properly gathered and accurately
>       reported. It is essential that the sample design, the
questionnaires
>       and the manner of interviewing meet the standards of objective
>       surveying and statistical techniques.

Id.

The proponent of the evidence has the burden of establishing these elements of admissibility. See id. In this case, we find that this burden was not met and that the methodology of the survey was so flawed that the district court's decision to admit it was not consistent with the exercise of sound discretion.

Knowlton's survey was designed to determine U.S. Healthcare's market share in the region close to three of Gary's six pharmacy locations. To determine market share, he had pharmacy students call six to eight to pharmacies within varying distances of each of the three pharmacies (resulting in a total universe of twenty pharmacies). The pharmacists at these pharmacies were then asked to name the HMO with which they did the majority of their business, and to report the percentage of their prescription business for which that HMO was responsible.

This methodology is flawed in several respects. We identify two particularly significant errors. First, the survey questions used were not objective. For example, pharmacists were asked:

35

estimate of U.S. Healthcare's market share resulting from Knowlton's survey -- which, in addition to the methodological errors set out in note 14, used the improper geographic market discussed at pp. 32-33, supra -- was twenty five percent. Even were we to accept this percentage as accurate, it is insufficient in itself to impose per se antitrust liability. See Jefferson Parish, 466 U.S. at 27 (defendant hospital's 30 percent share of market showed that it lacked the "kind of dominant market position that obviates the need for further inquiry into competitive conditions."); see also Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 612-13 (1953) (defendants share of 33-40 percent of advertising market insufficient to invoke per se rule). In fact, since Jefferson Parish no court has inferred substantial market power from a market share

_____

> You provide services for people with prescription cards, like PCS and
>
> Paid, et cetera. You also provide services for people on specific HMO
>
> plans like Keystone, U.S. Healthcare, et cetera. What's the name of
>
> the HMO with which you did the most prescription business . . .?

This question improperly slants the response by highlighting respondent to U.S. Healthcare's market presence. People responding to a survey tend to react to the framing of a question. See, e.g. J.R. Eiser, Social Psychology 219-20 (1986). In addition, this question specifically excluded large institutional, non-HMO purchasers of prescription drugs such as PCS and PAID. As a result, it narrowed the product market from "purchasers of prescription drugs" to "HMO purchasers of prescription drugs".

Second, while Knowlton surveyed 20 pharmacies, he only used the data obtained from 14 of those pharmacies in tabulating his results. This decision resulted from the fact that only fourteen of the twenty pharmacies surveyed named U.S. Healthcare as their largest HMO customer. Knowlton simply ignored the other six pharmacies whose data presumably stated a lower estimate of U.S. Healthcare's market share. This type of selective analysis violates the requirement that, in order for survey results to be admissible, the "data must be properly gathered and accurately reported".

We conclude that the cumulative effect of these, and other, methodological errors render it impossible to say that this survey was "conducted in accordance with generally accepted survey principles," and thus it should not have been admitted.

36

below 30 percent. See, e.g. Town Sound, 959 F.2d at 481 (affirming summary judgment for defendant with control of 10-12% of tying product market); Marts v. Xerox, 77 F.3d 1109, 1113 n.6 (8th Cir. 1996) (18% share of one portion of photocopier market too small for unlawful tying); Continental Trend Resources, Inc. v. OXY USA, Inc., 44 F.3d 1465, 1482 (10th Cir. 1995) (affirming grant of summary judgment for defendants where defendants controlled less than 10% of relevant market, since "plaintiffs failed to establish defendants had sufficient strength in the relevant market."), vacated on other grounds and remanded, 116 S. Ct. 1843 (1996); Breaux Bros. Farms, Inc. v. Teche Sugar Co., Inc, 21 F.3d 83, 87-88 (5th Cir. 1994) (17.5 percent share of relevant market for tying product "is not normally sufficient to satisfy the requirements of the per se rule.").

Because U.S. Healthcare's true market share in a properly defined geographic area could be no higher than 25 percent, plaintiff's cannot rely solely on market share to establish a per se antitrust violation.15

### b. Other Factors Bearing on Market Power

Factors other than market share can establish that U.S. Healthcare exercised appreciable power in the market for pharmaceutical customers. See Allen-Myland, 33 F.3d at 209. BCI contends that in this case market power can be inferred from the numerosity of the ties imposed by the defendants, and by "market realities" which indicate that the figures for prescription drug sales understate the importance of U.S. Healthcare members to a pharmacy's bottom line.

In order to demonstrate tying market power through evidence of the widespread acceptance of a tie, the plaintiff must show that the tie was accepted by an appreciable number of buyers within that market, and that there is an

_____

15. We note that evidence produced at trial showed that 16% of the residents of the greater Philadelphia area belong to a U.S. Healthcare plan. We assume, therefore, that U.S. Healthcare's market share in the relevant geographic market lies somewhere between 16%, its share in an impermissibly broad geographic market, and 25%, its share in an impermissibly narrow one.

"absence of other explanations for the[ir] willingness . . . to purchase the package." See Fortner II, 429 U.S. 610, 618 n.10 (1977); see also Grappone, Inc v. Subaru of New England, Inc., 858 F.2d 792, 797–98 (1st Cir. 1988) (widespread acceptance of tie not evidence of market power where there are plausible business reasons for accepting tie). In this case, BCI has failed to meet its burden.

At trial, the only evidence offered by BCI concerning other ties by defendants was that, with respect to six large chains -- Rite-Aid, Shop-Rite, Food Circus, Walmart, Phar-mor and Weis Markets -- defendants attempted to tie approval of additional pharmacies for participation in the U.S. Healthcare network to each chain agreeing to offer CHA and/or U.S. Healthcare to its employees. Of these purported tying attempts, only three -- those involving Rite-Aid, Phar-Mor and Weis Markets -- were deemed "successful" by the plaintiff. However, as we have already observed, BCI failed to demonstrate that these large companies did not base their decision to make U.S. Healthcare a part of their benefits package on plausible business reasons, see supra pp. 20–21. Without some such showing, the evidence of other tie-ins is insufficient to constitute proof of appreciable market power.[16]

BCI also argues that market power can be inferred from the fact that exclusion from the U.S. Healthcare pharmacy network would have a major adverse impact on a pharmacy, to the point of threatening that pharmacy's survival. BCI submits that since the prescription drug business is a low-margin business that depends on high volume, large purchasers such as U.S. Healthcare exert considerable market power. As an example of this market power, BCI again directs us to the evidence that U.S. Healthcare was able to lower its payment schedule to

_____

16. We further note that while it is apparent that Rite-Aid, Phar-Mor and Weis Markets are large chains, pharmacies are only a part of their business and BCI has offered no specific evidence that the number of pharmacies affected by the alleged tie-ins constituted "an appreciable number of buyers within the market."

38

pharmacies without loss of pharmacy participation in its network.17

This argument has two flaws. In the first instance, it proves too much. The evidence at trial showed that Gary's was a member of forty or more networks that provided access to pharmaceutical customers. There is no evidence, and no reason to believe, that the customers that U.S. Healthcare delivers are any more desirable than those delivered by other networks. Thus, if we accept the logic of BCI's argument, each of these networks exercises sufficient market power to violate the per se rule of antitrust liability. Yet, it would pervert the antitrust notion of market power to find that each of over forty organizations, delivering the same product, has sufficient market power over a pharmacy such as Gary's to generate a per se violation of the antitrust laws.

BCI's argument also runs counter to the purpose of the antitrust laws. "The purpose of the Sherman Act `is not to protect businesses from the working of the market; it is to protect the public from the failure of the market.' " Queen City Pizza, 124 F.3d at 441 (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993)); see also Town Sound, 959 F.2d at 494 (it is "no concern of the antitrust laws" that a practice may consign even an entire "class of competitors . . . to competitive oblivion," unless "consumers [a]re also hurt because of diminished competition."); United States v. Syufy Enterprises, 903 F.2d 659, 668 (9th Cir. 1990) ("[i]t can't be said often enough that the antitrust laws protect competition, not competitors."). If we were to accept BCI's argument that a showing of appreciable market power can be based solely on a pharmacy's "need" for customers, we would in effect outlaw the agglomeration of pharmacy customers -- a result that provides benefits to individual consumers -- in order to protect pharmacies. This result would stand antitrust jurisprudence on its head, and establish a precedent whereby the antitrust laws would protect competitors rather than competition and consumers.

_____

17. See supra p. 21.

C. The Rule of Reason Claim

The jury also found that defendants were liable under the rule of reason standard for antitrust violations. Unlike a per se case where a showing that the defendant had market power in the tying market leads to a presumption that it is using that power to expand into the tied market, to succeed on a rule of reason claim the plaintiff must prove that the alleged tie "unreasonably restrained competition." Jefferson Parish, 466 U.S. at 29; see also Town Sound, 959 F.2d at 495 (in order to support a rule of reason claim, plaintiff must prove that the tie in question caused an "injury to competition"). This burden "necessarily involves an inquiry into the actual effect of the [challenged conduct] on competition [in the tied market]." 466 U.S. at 29.18

_____

18. BCI contends that by failing to specifically challenge the sufficiency of the evidence of anti-competitive effects in the tied market in their pre-verdict motions for judgment as a matter of law made pursuant to Fed. R. Civ. P. 50(a), defendants waived their right to raise that specific argument in their post-trial Rule 50 motions, or thereafter. In their pre-trial motions, made both at the conclusion of plaintiff's case and at the conclusion of all evidence, the defendants' challenge to the sufficiency of the evidence on the rule of reason claim read:

        The evidence is insufficient to support a finding or sustain a verdict
        that U.S. Healthcare's practices constituted an unreasonable
        restraint of trade in light of all the circumstances of the case.
        Plaintiff has offered no such evidence.

Under Rule 50(a), a pre-verdict motion for judgment as a matter of law "shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." Further, a post-trial motion for judgment as a matter of law made pursuant to Rule 50(b) "must be preceded by a Rule 50(a) motion sufficiently specific to afford the party against whom the motion is directed with an opportunity to cure possible defects in proof which otherwise might make its case legally insufficient." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1173 (3d Cir. 1993) (quoting Acosta v. Honda Motor Co., 717 F.2d 828, 831-32 (3d Cir. 1983)); see also Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 183-84 (3d Cir. 1992) (compliance with Rule 50(a) "ensures that the party bearing the burden of proof will have an opportunity to buttress its case before it goes to the jury and the moving party will not gain unfair advantage through surprise.").

While the text of the Rule 50(a) motion quoted above is far from a model of completeness or clarity, we do not measure its sufficiency by

Before we can determine whether there was harm to competition in the tied market, that market must be defined. BCI had the burden of defining the tied market, but made no attempt to do so at trial. On appeal, BCI contends that the tied market consists of the market for the provision of health insurance and benefits -- a market that includes HMOs and personal choice plans in addition to TPAs. We find no support for this broad market definition. Instead, we believe, on the basis of the record, that the proper tied market consists solely of the market for TPA services. BCI is a TPA provider and the harm alleged to have occurred as result of the tying arrangement took place in the market for TPA services.

In that market, the only evidence of harm to competition was that BCI failed to renew one contract, its contract with Gary's. That showing is insufficient as a matter of law since it fails to show competitive harm to the tied market as a whole. See Town Sound, 959 F.2d at 493 (requiring foreclosure of a "substantial portion" of the tied market to hurt competition.); see also Virtual Maintenance, Inc. v. Prime Computer, Inc., 957 F.2d 1318, 1330 (6th Cir.) ("[t]he foreclosure of 400 computer systems out of the thousands of systems [in the tied market] is insignificant as a matter of law"), vacated, 506 U.S. 910 (1992), reinstated in pertinent part, 11 F.3d 660, 663-64 (6th Cir. 1993).

Moreover, even if we accepted the broad market which BCI proposed, it still failed to provide sufficient evidence of competitive harm. The only evidence offered to show that competition was adversely affected in this broad market

_____

the text alone, but against the background, as reflected in the record, of what the party now claiming waiver understood as to the tenor of the Rule 50 movant's position and theory. See Acosta, 717 F.2d at 832 ("[T]he communicative content, `specificity' and notice giving function of an assertion [in a rule 50(a) motion] should be judged in context.") In Fineman, for example, we held that a general motion for a directed verdict contesting the sufficiency of the evidence with respect to "coercion" preserved defendant's challenge to the sufficiency of the evidence with respect to the tortious interference claim, because "plaintiffs' counsel was clearly on notice of the legal rubric under which [defendants] planned to proceed." 980 F.2d at 184. We think that is the case here, and hence find no waiver.

41

consisted of the previously mentioned studies of several
large pharmacy chains which faced pressure to offer their
employees membership in the U.S. Healthcare HMO. These
studies do not provide any evidence of market foreclosure
or harm to competition since those pharmacies that were
"forced" to offer their employees U.S. Healthcare coverage
did so in addition to, rather than instead of, other health
insurance plans. Further, even if this evidence did show
harm to competition, BCI has introduced no evidence in
which to evaluate the extent to which such foreclosure
harmed competition in the broad market for health
insurance services generally.

D. Conclusion

Since the record before us does not support a finding
that U.S. Healthcare exercised appreciable market power in
a properly defined tying market or that the arrangement at
issue harmed competition in the tied market, the antitrust
jury verdicts on both the per se and the rule of reason
claims must be set aside.19

IV. CIVIL RICO

A. Introduction

The jury found that U.S. Healthcare's business practices
constituted a pattern of racketeering activity in violation of
18 U.S.C. SS 1962(c) and (d). Section 1962(c) prohibits any
person employed by or associated with an enterprise from
conducting or participating in the conduct of that
enterprise's affairs through a pattern of racketeering
activity. A pattern of racketeering activity "requires at least
two acts of racketeering activity", 18 U.S.C.S 1961(5).
Racketeering activity is defined as an act or threat
chargeable as one of a variety of state felonies or any act
which is "indictable" under specifically listed federal
criminal statutes, see 18 U.S.C. S 1961(A)-(B). Section
1962(d) outlaws any conspiracy to violate the other
_____

19. Since we find that the jury verdict must be set aside, we need not
address defendants challenge to the rule of reason jury instructions.

42

subsections of S 1962, including, as is relevant to this case, S 1962(c).

U.S. Healthcare challenges the jury verdict on two primary grounds, asserting that (1) BCI failed to establish its standing to recover for any offenses allegedly committed against Gary's; and (2) BCI failed to present a su stainable case that the defendants committed any of the alleged predicate acts. We address each argument in turn.

B. RICO Standing

The section of RICO allowing private parties such as BCI to pursue a civil action provides that:

> [a]ny person injured in his business by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. S 1964(c)

The Supreme Court examined the standing requirement of this statutory provision in Holmes v. Securities Investor Protection Corp., 503 U.S. 258 (1992). The Court noted that Congress modeled S 1964(c) on the Clayton Act, and found that a plaintiff's right to sue under RICO, as under the federal antitrust laws, requires a showing that the alleged violation was the proximate cause of the plaintiff's injury. See id. at 267-68. The Court looked to the common law for guidance in defining the proximate cause requirement. In so doing, it focused primarily on one element of proximate cause: the directness of the relationship "between the injury asserted and the injurious conduct alleged." Id. at 268. This requirement of a direct relation was held to generally preclude recovery by "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts." Id. at 268-69.

On the facts presented in Holmes, the Court held that the plaintiff, Securities and Investor Protection Corporation ("SIPC"), had not met the proximate cause requirement and thus had no standing to bring suit under RICO . SIPC is a

43

private nonprofit corporation, created pursuant to the Securities Investors Act, which most broker-dealers are required by law to join and which has a statutory duty to advance funds to reimburse the customers of member broker-dealers that are unable to meet their obligations. See id. at 261. SIPC brought a civil RICO action alleging that Holmes, and other former members of a brokerage firm, conspired in a stock manipulation scheme that prevented two broker-dealers from meeting their obligations, thereby requiring SIPC to advance nearly $13 million to cover claims by the customers of the affected broker-dealers. SIPC sought standing under S 1964(c) by arguing, inter alia, that it was subrogated to the rights of those customers of the broker-dealers who did not purchase the manipulated securities but incurred loses when the broker-dealers failed and could no longer meet their obligations. See id. at 270.

The Court assumed, for the sake of argument, that SIPC was entitled to stand in the shoes of the non-purchasing customers, but held that the defendants' conduct was not the proximate cause of those customers' injuries. The Court held that "the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker dealers . . . [t]he broker-dealers simply cannot pay their bills, and only that intervening insolvency connects the conspirators' acts to the losses suffered by the non-purchasing customers and general creditors." Id. at 271.

Defendants' argue that, under Holmes, BCI lacks standing in this case. They assert that since BCI is alleging that Gary's has been a victim of the RICO predicate acts, BCI exemplifies the "plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person." Id. at 268. We disagree. The injury proved by BCI, the loss of its TPA contract with Gary's, is not derivative of any losses suffered by Gary's. Unlike the injuries suffered by the non-purchasing customers in Holmes, BCI's injury was not contingent upon any injury to Gary's, nor is it more appropriately attributable to an intervening cause that was not a predicate act under RICO. Here, BCI's TPA relationship with Gary's was a direct target of the alleged

44

scheme -- indeed, interference with that relationship may well be deemed the linchpin of the scheme's success. Accordingly, we conclude that BCI had standing to pursue its civil RICO claim.[20]

C. Predicate Acts of BCI's RICO Claim

In its special verdict form, the jury found that each defendant had committed one or more types of the predicate acts of: (1) extortion under the Hobbs Act, 18 U.S.C. S 1951; (2) violation of Pennsylvania's commercial bribery statute, 18 Pa. Cons. Stat. S 4108(b); (3) mail fraud, 18 U.S.C. S 1341; (4) wire fraud, 18 U.S.C. S 1343; and (5) violation of the Travel Act, 18 U.S.C. S 1952. Defendants challenge the verdict on the ground that BCI has failed to prove that defendants' conduct violated any of these laws. Defendants contend that this failure to prove any predicate acts, and a fortiori to show a pattern of racketeering activity, entitles them to judgment as a matter of law on the RICO claims. In their submission, the conduct underlying each of the alleged predicate acts was at its bottom no more than aggressive business bargaining and, just as BCI cannot convert aggressive business tactics into antitrust violations, it cannot shoehorn such tactics into the definitions of the predicate acts at issue here. We shall devote the bulk of our time to the important and difficult issue of whether the defendants' conduct amounted to Hobbs Act extortion. The others alleged predicate acts are disposed of easily .

1. Extortion under the Hobbs Act

The Hobbs Act imposes criminal penalties on "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so."

_____

20. We note, however, that BCI's RICO standing is limited to injuries arising from its competition with U.S. Healthcare for Gary's TPA business. BCI does not have RICO standing to recover for any injuries suffered by other pharmacies as a result of their relations with U.S. Healthcare since there is no evidence that these relations directly injured BCI.

18 U.S.C. S 1951. "Extortion" is defined in the Act as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. S 1951(b)(2). The term "fear" includes the fear of economic loss. See United States v. Addonizio, 451 F.2d 49, 72 (3d Cir. 1972); United States v. Capo, 817 F.2d 947, 951 (2d Cir. 1987) (in banc).

BCI alleges that the defendants extorted Gary's health benefits business by conditioning access to the U.S. Healthcare provider network on Gary's agreement to switch to CHA as its TPA. According to BCI, this conduct amounts to extortion through the wrongful use of the fear of economic loss. Defendants respond that the use of economic leverage in this manner cannot be made tofit within the statutory framework of Hobbs Act extortion. They reason that any fear of economic loss felt by Gary's was the result of the give and take of bargaining between U.S. Healthcare and Gary's in a business setting in which both parties offered and received something of value. They contend that the use of this economic fear to extract concessions from Gary's was not wrongful, as required by the Hobbs Act, but is instead part and parcel of normal business negotiations.

As will appear, we conclude that plaintiff's theory, which is quite ingenious, does not state a viable claim of extortion because the defendants' use of the fear of economic loss in the context of hard business bargaining was not (legally) wrongful. While this decision may seem compelled by common sense, it is not easily derived from our precedent. This Court has not had prior occasion to address the line separating the legitimate use of economic fear to acquire property in a business setting (i.e., hard bargaining) from the wrongful use of such fear (i.e., extortion). Accordingly, we turn for guidance to the decisions of those few courts that have previously faced the issue. Because it looms so large on the Hobbs Act landscape, we must first, however, consider the Supreme Court's decision in United States v. Enmons, 410 U.S. 396 (1973), which construes the meaning of the term "wrongful" under the Act.